Francisco ALCARAZ; Leticia Cardenas
Alcaraz, Petitioners,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 01–71171.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 8, 2003.

Filed Oct. 1, 2004.

Victor D. Nieblas Pradis, Los Angeles, CA, for the petitioners.

Mary Jane Candaux, (argued), U.S. Justice Department, Office of Immigration Litigation, Edward C. Durant, (brief) U.S. Justice Department, Office of Immigration, Washington, DC, for the respondent.

Before PREGERSON, TASHIMA, and CLIFTON, Circuit Judges.

PREGERSON, Circuit Judge.

Petitioners Francisco and Leticia Alcaraz petition for review of a decision of the Board of Immigration Appeals ("BIA") that affirmed a decision of an Immigration Judge ("IJ") who ordered their removal and denied their application for suspension of deportation. The Alcarazes were statutorily eligible for suspension of deportation at the time they submitted their application. But before the date their applications were to be heard on the merits, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Section 309 of that Act retroactively made them ineligible for suspension of deportation. Specifically, IIRIRA § 309(c)(5) retroactively changed the date that the clock stopped for calculating whether an alien met the seven-year residency requirement for suspension of deportation. As a result, when the Alcarazes went to their scheduled merits hearing, they were denied suspension of deportation because they fell thirty days short of the seven-year residency requirement under IIRIRA's new statutory scheme.

In passing IIRIRA § 309, Congress included a safety-net provision for aliens rendered ineligible for suspension of deportation because of the retroactive stop-time rule. Section 309(c)(3) of IIRIRA authorizes the Attorney General to provide such aliens an opportunity to apply for a

new form of relief enacted in IIRIRA, Cancellation of Removal. After the Alcarazes filed their briefs with the BIA, but before the Alcarazes' appeal was heard by the BIA, the Attorney General, through a series of policy directives, implemented her power pursuant to IIRIRA § 309(c)(3). Specifically, the Immigration and Naturalization Service ("INS") and the Executive Office of Immigration Review ("EOIR"), both under the Department of Justice, issued policy directives instructing the BIA to administratively close the cases of all eligible aliens who qualified for suspension of deportation but for the new stop-time rule. The cases of qualifying aliens were administratively closed to allow the aliens to reapply for cancellation of removal. The INS called this process "repapering."

But when the BIA reviewed the Alcarazes' case, it failed to consider them for repapering despite the fact that they were clearly eligible. Instead, it affirmed the IJ's decision and ordered the Alcarazes deported. The Alcarazes appeal. We grant their petition and remand to the BIA for a determination whether, in light of the various policy statements issued by the INS and EOIR, it was obligated to repaper the Alcarazes.

## STATUTORY SCHEME

Before 1996, an alien was eligible for suspension of deportation if: (1) he or she had been physically present in the United States for a continuous period of not less than seven years *immediately preceding the date an alien filed an application for suspension of deportation;* (2) he or she was a person of good moral character; and (3) deportation would result in extreme hardship to either the alien or an immediate family member who was a United States citizen or lawful permanent resident. Immigration and Nationality Act ("INA") § 244(a)(1), 8 U.S.C. § 1254(a)(1) (1994); *Ram v. INS,* 243 F.3d 510, 513 (9th Cir.2001). An alien in deportation proceedings before 1996 "continued to accrue time towards satisfying the seven-year residency requirement for suspension of deportation during the pendency of the proceedings." *Jimenez-Angeles v. Ashcroft,* 291 F.3d 594, 598 (9th Cir.2002).

Then in 1996 and 1997, Congress enacted two statutes that altered immigration law. Section 309 of IIRIRA replaced suspension of deportation with a new form of relief, entitled "cancellation of removal." IIRIRA § 304(a)(3); 110 Stat. at 3009-587, INA 240A(d), 8 U.S.C. § 1229(d) (2000). To qualify for cancellation of removal under the new statutory scheme, an alien must meet stricter eligibility requirements, including a longer period of residence (ten years) than was required under the former suspension of deportation scheme. *Compare* 8 U.S.C. § 1254(a)(1) (1994) *with* 8 U.S.C. § 1229b(b)(1) (2000). With regard to pending applications for suspension of deportation, IIRIRA, together with the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), *retroactively* changed the end-date that stopped the clock for measuring the time an applicant was physically present in the United States for eligibility for suspension of deportation.[1] The new rule changed the date

1. In *Ram,* we held that the stop-time rule in IIRIRA § 309 applies retroactively to aliens who had an application for suspension of deportation *pending* after the April 1, 1997 effective date of IIRIRA. *Ram,* 243 F.3d at 516. ("309(c)(5)(A) generally applies the stop-time rule to transitional rule aliens whose deportations were initiated with the service of an OSC and who seek suspension of deportation."); *but see Otarola v. INS,* 270 F.3d 1272, 1276-77 (9th Cir.2001) (holding that retroactive stop-time rule does not apply to an alien who had his merits hearing on his application for suspension of deportation before an IJ before IIRIRA became effective [on Apr. 1, 1997] even though the BIA reviewed his case after IIRIRA became effective). In *Ram,* we

the "clock stopped" from the date that an alien filed his or her application for suspension of deportation with the INS to the date the INS served an alien with an *Order to Show Cause* ("new stop-time rule").[2] IIRIRA §§ 309(c)(1), 309(c)(5), 110 Stat. at 3009-625-277, NACARA § 203(a)(1), Pub. L. No. 105-100, 111 Stat. 2160, 2196 (Nov. 19, 1997), amended by Pub. L. No. 105-139, 111 Stat. 2644 (Dec. 2, 1997).

But Congress did not leave aliens who were caught by the new retroactive stop-time rule out in the cold. Section 309(c)(3) of IIRIRA authorizes the Attorney General to terminate the cases of aliens in deportation proceedings prior to the effective date of IIRIRA, and then reinstate the proceedings under the new statutory scheme as "removal proceedings." IIRIRA § 309(c)(2), Pub. L. 104-208, *as amended by* Pub. L. 104-302, 110 Stat. 3657 (1996) (codified at 8 U.S.C. § 1101 note). Section 309(c)(3) permits the Attorney General to allow aliens who would have been eligible for suspension of deportation *but for the new stop-time rule* to be placed in removal proceedings where they may apply for cancellation of removal under 8 U.S.C. 1229b, INA § 240A(b).

The Attorney General took steps to implement her power under § 309(c)(3). First, the Department of Justice began to draft a regulation that would enable aliens who were rendered ineligible for suspension of deportation because of the retroactive stop-time rule to apply for cancellation of removal. But until the regulations were promulgated, the Attorney General, through the Immigration and Naturalization Service and the Executive Office of Immigration Review, issued several directives to the BIA to administratively close removal proceedings of eligible aliens through a process called "repapering." INS General Counsel Bo Cooper, in a December 7, 1999 Memorandum entitled "Administrative Closure of Executive Office for Immigration Review Proceedings for Non-Lawful Permanent Resident Aliens Eligible for Repapering," outlined the procedure for providing repapering relief to eligible aliens. Memorandum of Bo Cooper, General Counsel for the INS, dated Dec. 7, 1999 ("*Cooper Memorandum*"), *reproduced in* 77 Interpreter Releases 39, App. 1 (Jan. 10, 2000), *available at* http://www.usdoj.gov/eoir/chip4.pdf. The *Cooper Memorandum* directed the BIA to sua sponte close cases where aliens are eligible for repapering. *Id.* at *2 ("The Board *will* sua sponte administratively close cases meeting the above criteria on a case-by-case basis.") (emphasis added).

also rejected the petitioners' equal protection, due process, and statutory construction challenges to the retroactive stop-time rule. 243 F.3d at 516-19. Our decision in *Ram* is inapposite to petitioners' repapering claim. Instead, in addressing the Alcarazes' repapering claim, we focus on the BIA's obligation to provide relief to aliens who were disadvantaged by the retroactive stop-time rule. In arguing that the BIA erred by failing to repaper them, the Alcarazes assume that the stop-time rule applies retroactively; eligibility for repapering is *conditioned* on aliens being disadvantaged by the retroactive stop-time rule.

**2.** In IIRIRA § 309(c)(5)(A), the new stop-time rule "appl[ies] to *notices to appear* ... issued before, on, or after the date of the enactment of this Act [April 1, 1997].". On November 19, 1997, Congress amended the language of the IIRIRA effective date in 203(a) of NACARA. Under NACARA § 203, the April 1, 1997 effective date was changed to the date the INS issued an alien an *order to show cause*. NACARA § 203(a) ("paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to orders to show cause (including those referred to in section 242B(a)(1) of the Immigration and Nationality Act, as in effect before the title III-A effective date), issued before, on, or after the date of the enactment of this Act.").

Under this directive, an alien qualified for repapering if (1) he or she was not a lawful permanent resident, (2) he or she was statutorily eligible for suspension of deportation under the pre-IIRIRA statutory scheme, and (3) he or she was eligible for cancellation of removal under the new statutory scheme.[3] *Id.* at *1–2.

On March 14, 2000, the Vice–Chair of the Board of Immigration Appeals issued a memorandum, "Non–Lawful Permanent Resident Repapering," to the Board Legal Staff describing the forthcoming repapering regulations and listing the requirements an alien must meet to be repapered. Memorandum of Lori L. Scialabba, Vice Chair of the BIA, dated March 14, 2000 ("*Scialabba Memorandum*"), *available at* http://www.usdoj.gov/eoir/chip6.pdf. In her memorandum, Vice Chair Scialabba again confirmed the BIA's policy of administratively closing the cases of aliens eligible for repapering. *Id.* ("Until this regulation is promulgated, to ensure that such aliens will be able to avail themselves of the opportunity to request repapering when the regulation is published, the Board plans to administratively close the proceeding of any alien who appears eligible for non-LPR repapering."). *See also Rojas–Reyes v. INS,* 235 F.3d 115, 125 (2d Cir.2000) ("The INS has decided to administratively close the proceeding of any alien who appears eligible for ... repapering." (citing INS Memorandum from Lori Scialabba)).

In a meeting between the EOIR and an American Immigration Lawyers Association liaison ("AILA") on March 20, 2000, the EOIR reported that: "[t]he Board will administratively close the proceedings of any alien who appears eligible for repapering in accordance with the criteria agreed to between INS and EOIR. The Board began closing the cases of non-LPRs who appear eligible for repapering on March 16, 2000." EOIR/AILA Liason Meeting, *available at* http://www.usdoj.gov/eoir/statspub/qaeoiraila.htm; *see also* 1 Immigration Law and Defense § 8:39, n. 1 (August 2002). In response to AILA's question regarding whether the"EOIR issued instructions to its Judges and the BIA confirming the repapering procedures," the EOIR referred AILA to the INS's and EOIR's memoranda on repapering. *Id.* ("The Chief Immigration Judge has issued two memorandums on repapering dated December 9, 1998 and December 7, 1999, as attached (together with related December 1998 and December 1999 INS memoranda). A Vice Chairman of the Board and the former Chief Attorney Examiner issued guidance to the Board staff by memoranda dated November 10, 1998 and March 14, 2000, as attached.").

3. In addition, in a memorandum dated December 7, 1998 INS General Counsel Paul Virtue issued a memorandum requiring all INS attorneys assigned to a case where an alien is eligible for repapering to inform that alien about his or her ability to request administrative closure. Memorandum of Paul W. Virtue, General Counsel for the INS, dated Dec. 7, 1998 ("*Virtue Memorandum*"), *reproduced in* 76 Interpreter Releases 39, App. 1, at *4–5 (Jan. 10, 2000). The *Virtue Memorandum* also instructs INS attorneys that when an alien or Immigration Judge requests repapering, "the INS generally should agree to the administrative closing of a proceeding before an immigration judge where the alien meets the [repapering] criteria at the time the request for administrative closing is made." While it is permissible to refuse to agree to administrative closure if there are "unusual" adverse factors in the case, the *Virtue Memorandum* cautioned that "[t]his should be the exception, however, and must be approved by the Office of the General Counsel." The *Virtue Memorandum* also confirmed that the INS "expect[s] the Board to sua sponte administratively close cases meeting the [repapering] criteria on a case-by-case basis, with written notification to the INS attorney of record."

On August 28, 2000, BIA Chairman Paul Schmidt issued another memorandum to all BIA judges describing, among other things, the BIA's administrative procedures for repapering. Memorandum of Paul Schmidt, Chairman of the Executive Office of Immigration Review, dated Aug. 20, 2000 (*"Schmidt Memorandum"*), *available at* http://www.usdoj.gov/eoir/vll/genifo/streamimplem.pdf. The *Schmidt Memorandum* authorizes a single BIA judge to exercise the authority of the BIA for "Non-Lawful Resident Repapering cases [any cases in which the Attorney General is authorized to terminate deportation proceedings and reinitiate removal proceedings under section 309(c)(3) of IIRIRA]." *Id.* at 6 (brackets in original).

And on November 30, 2000, the INS and the EOIR promulgated a proposed rule that allows aliens to apply for repapering. Delegation of Authority to the Immigration and Naturalization Service To Terminate Deportation Proceedings and Initiate Removal Proceedings, 65 Fed.Reg. 71,273 (proposed Nov. 30, 2000) (to be codified at 8 C.F.R. § 240.3). The comments to the proposed rule state that:

> The Attorney General has decided to exercise the discretion granted to her in section 309(c)(3) of IIRIRA in individual cases on behalf of certain lawful permanent residents who are caught in the window of disadvantage between the enactments of AEDPA and IIRIRA and certain non-LPRs affected by the stop time rule in section 240A(d)(1) of the Act.

*Id.* To date, proposed 8 C.F.R. § 240.3 has not been promulgated. However, there are at least some indications that the INS implemented its repapering policy, expecting the BIA to close cases administratively until the promulgation of final regulations. 77 Interpreter Releases 39 (Jan. 10, 2000) (discussing Cooper Memorandum); Austin Fragomen, Jr. et. al., Immigr. Legis. Handbook § 4.36 (2001) ("In anticipation of a final rule, the INS has provided for the administrative closure of cases expected to be eligible for repapering."); 76 Interpreter Releases 159 (Jan. 25, 1999) ("As an interim measure until the regulation is published, the INS and the Executive Office of Immigration Review have released field instructions that provide for the administrative closing of proceedings involving aliens who would qualify.... The INS said that it expects the BIA to sua sponte administratively close cases meeting these [repapering] criteria on a case-by-case basis."); Anna Gallagher, Immigration Law Service 1 2d § 1:167 (citing EOIR's policy permitting one BIA member to exercise her authority on "cases to be administratively closed for non-LPR repapering").

## FACTUAL BACKGROUND

Petitioners Francisco and Leticia Alcaraz entered the United States from Mexico without inspection on or about July 10, 1989. The married couple has continuously resided and worked in the United States since that date. Mrs. Alcaraz works as a housekeeper, and Mr. Alcaraz is a baker at a supermarket in Santa Ana, California. The Alcarazes have a nine year old United States-citizen child, Paula.

On April 15, 1996, the Alcarazes applied for Asylum and Withholding of Deportation with the INS. On June 11, 1996, the INS issued Orders to Show Cause charging both Mr. and Mrs. Alcaraz with deportability under Section 241(a)(1)(b) of the INA for entering without inspection.

On July 19, 1996, the Alcarazes made their first appearance before an IJ. The IJ informed them that they were "suspension eligible" under former INA § 244A. The Alcarazes subsequently withdrew their asylum application, conceded deportability, and requested relief in the form of suspension of deportation or, in the alternative,

voluntary departure. The IJ set a hearing on October 2, 1996 to allow the Alcarazes to formally file their application for suspension of deportation and to execute the Alcarazes' application.

The Alcarazes subsequently filed their applications for suspension of deportation. With their applications, they included tax returns, receipts, supportive letters, and other documents establishing that they were of good moral character and that they had resided in the United States since July 10, 1989. On October 2, 1996, the IJ executed the Alcarazes' applications for suspension of deportation. Although the Alcarazes were prepared for a merits hearing on October 2, the IJ set a merits hearing for June 19, 1997, over eight months later. Under the law in effect at the time that the Alcarazes formally filed their applications for suspension of deportation, they were statutorily eligible for that relief. To be eligible for suspension of deportation at that time, the Alcarazes were required to establish that they were physically present in the United States for a continuous period of not less than seven years *immediately preceding the date of filing an application for suspension of deportation.* INA § 224(a)(1), 8 U.S.C. § 1254(a)(1) (1994). Because the Alcarazes entered the United States on *July 10, 1989* and applied for suspension on *October 2, 1996,* they met the seven year residency requirement.

But before the Alcarazes' merits hearing on June 19, 1997, Congress enacted the changes in law described above, which retroactively changed the stop-time rule governing the physical presence requirement. Thus, on June 19, 1997, the IJ did not hear the merits of their application for suspension of deportation as scheduled. Instead, the IJ informed the Alcarazes' that they were no longer eligible for suspension of deportation under the new stop-time rule as construed by the BIA's decision in *In re N–J–B–,* 1997 WL 107593, 21 I. & N. Dec. 812, Int. Dec. 3309 (BIA 1997). The IJ held that under the new stop-time rule, which retroactively changed the date the clock stopped for measuring residency in the United States to the date the INS served an alien with an order to show cause, the Alcarazes were now approximately thirty days short of the seven years of continuous presence required for suspension of deportation because their Order to Show Cause was issued on June 11, 1996. The IJ then ordered the Alcarazes deported to Mexico. The IJ, however, granted them voluntary departure.

The Alcarazes were required to appeal their decision to the BIA by July 20, 1998. The Alcarazes, acting pro se, filed a timely appeal. In their appeal to the BIA, the Alcarazes argued that the IJ erroneously denied their application on the merits. After the Alcarazes' appeal was duly filed, the INS issued the internal memoranda instructing the BIA to administratively close cases of eligible aliens and draft repapering regulations. *See Scialabba Memorandum; Cooper Memorandum; see also Virtue Memorandum; Schmidt Memorandum.*

On June 18, 2001, the BIA issued its final decision. The BIA, however, failed to consider whether the Alcarazes were eligible for repapering. Instead, the BIA affirmed the IJ's decision to grant voluntary departure and deny the Alcarazes' applications for suspension of deportation. Specifically, the BIA held that under *Matter of Nolasco–Tofino,* 1999 WL 261565, 22 I. & N. Dec. 632, Interim Decision 3385 (BIA 1999), the stop-time rule applied to all pending applications for suspension of deportation. Thus, the BIA agreed with the IJ and held that the Alcarazes were not eligible for suspension of deportation because they did not meet the seven-year residency requirement under the new

stop-time rule. The BIA, however, misstated the date that the INS issued its OSC to the Alcarazes as July 19, 1996, when in fact it was issued on June 11, 1996.

## PROCEDURAL HISTORY

On appeal to this court, the Alcarazes present three legal challenges to the BIA's decision. First, the Alcarazes argue that the BIA's decision is not supported by the evidence because the BIA misstated the date that the INS issued an Order to Show Cause to the Alcarazes. Second, the Alcarazes contend that they are eligible for suspension of deportation under the doctrine of equitable tolling. One month prior to oral argument, the Alcarazes filed a F.R.A.P. 28(j) letter, arguing that the BIA erred by failing sua sponte to close their case because they were eligible for repapering. To support their claim, the Alcarazes attached copies of the INS memorandum outlining the eligibility requirements for repapering and instructing the BIA to close removal proceedings of eligible aliens and allow them to apply for cancellation of removal. *See Schmidt Memorandum; Cooper Memorandum; Virtue Memorandum.* In addition, the Alcarazes attached several decisions in which the BIA had sua sponte closed aliens' cases where they were eligible for repapering. At oral argument, both parties addressed the BIA's failure to sua sponte close the Alcarazes' case pursuant to the repapering rules. After oral argument, we requested supplemental briefs on whether we had jurisdiction to hear the Alcarazes' repapering claim and whether the BIA erred in failing to repaper the Alcarazes.

## STANDARD OF REVIEW

The BIA's determination of purely legal questions regarding the INA is reviewed de novo. *Socop-Gonzalez v. INS,* 272 F.3d 1176, 1187 (9th Cir.2001) (en banc). We also review claims of due process violations in INS proceedings de novo. *Rodriguez-Lariz v. INS,* 282 F.3d 1218, 1222 (9th Cir.2002).

## REPAPERING

### A.

Before we turn to the merits of the Alcarazes' repapering claim, we must determine whether we have jurisdiction to consider that claim. The government argues that we do not have jurisdiction over the Alcarazes' repapering claim because they did not raise the issue before the BIA. Thus, the government argues, the Alcarazes failed to exhaust their administrative remedies on this issue; therefore, we do not have jurisdiction to address that claim under 8 U.S.C. § 1252(d)(1). The government also argues that we lack jurisdiction because the decision at issue is an unreviewable agency determination. We conclude that we have jurisdiction over the Alcarazes' repapering challenge.

Under 8 U.S.C. § 1252(d)(1) this court has jurisdiction over an order of removal only if "the alien has exhausted all administrative remedies available to the *alien as of right.*" 8 U.S.C. § 1252(d)(1) (emphasis added). We interpret "as of right" in § 1252(d)(1) to require an alien to exhaust his or her claims by raising them on *direct appeal* to the BIA. *See Castillo-Villagra v. INS,* 972 F.2d 1017, 1023–24 (9th Cir.1992).

But there are several exceptions to the exhaustion requirement. We do not require an alien to exhaust administrative remedies on legal issues based on events that occur *after* briefing to the BIA has been completed. In *Castillo-Villagra,* for example, we considered the case of a family from Nicaragua, a mother and two adult daughters, who applied for asylum. The petitioners based their application for asylum on their membership in a political

group that opposed the Sandanista regime in Nicaragua. The IJ denied their application for asylum because the mother lied during the hearing and because none of the petitioners established a well-founded fear of persecution. Petitioners appealed the IJ's decision to the BIA. After they filed their briefs with the BIA, but before the BIA made its decision, the government of Nicaragua changed so that the Sandinistas were no longer in power. *Castillo–Villagra,* 972 F.2d at 1022–23. The BIA took administrative notice of the changed country conditions and denied the petitioners' application for asylum since the BIA believed that the applicants should no longer fear persecution under the new government. Because the BIA based its ruling on changed country conditions, it did not review the IJ's negative credibility determination, nor did it review the IJ's decision on the merits. The petitioners did not seek the additional redress of filing a "motion to reopen" with the BIA, which aliens are permitted to do under INS regulations.

On appeal to this court, the INS argued that we lacked jurisdiction over the petitioners' challenge to the BIA's decision. *Id.* at 1023. Specifically, the INS argued that because the petitioners did not raise the changed country conditions in their briefs on direct appeal to the BIA and did not move to reopen their proceedings after the BIA issued its decision, they had not exhausted their administrative remedies on the issue. We disagreed with the INS because the petitioners could not raise the changed country issues on direct appeal.

Also, we held that the petitioners were not required to file a motion to reopen with the BIA because it is not a statutory remedy. Thus, we concluded that we had jurisdiction over the matter. *Id.* at 1024.

The issue whether the Alcarazes exhausted their administrative remedies with regard to their repapering argument is controlled by *Castillo–Villagra.* As in *Castillo–Villagra,* the *legal issue* that the Alcarazes raise to this court could not be briefed on their direct appeal to the BIA because the INS issued its repapering policies to the BIA a year and a half *after* the date when the Alcarazes were required to submit their briefs to the BIA. The EOIR required the Alcarazes to submit their briefs to the BIA Appeals Processing Unit by *July 20, 1998.* The Alcarazes, acting pro se, timely submitted their brief to the BIA on July 20, 1998. The INS General Counsel issued the *Cooper Memorandum* telling the BIA to sua sponte close deportation proceedings where aliens are eligible for repapering on *December 7, 1999. Cooper Memorandum.* The Vice Chair of the BIA issued the *Scialabba Memorandum* announcing the Board's plan to administratively close the proceeding of eligible aliens on *March 14, 2000. Scialabba Memorandum.* The Chairman of the BIA issued the *Schmidt Memorandum* to BIA judges authorizing one BIA judge to handle repapering cases on *August 28, 2000. Schmidt Memorandum.* The INS and EOIR issued the proposed rule regarding repapering on *September 30, 2000.* 65 Fed.Reg. 71,273. The BIA issued its decision holding that the Alcarazes were ineligible for suspension because of the new retroactive stop-time rule on *June 18, 2001.*

Thus, the Alcarazes were unable to exhaust their administrative remedies because the *Cooper Memorandum, Scialabba Memorandum, Schmidt Memorandum,* and the proposed regulation were issued after they were required to submit their briefs to the BIA. This situation is identical to the facts in *Castillo–Villagra,* where the aliens could not brief the changed country conditions on direct appeal to the BIA because the events took place after their briefing to the BIA was due.

■ All of the avenues available to the Alcarazes for raising the repapering argument before the BIA (whether through a motion to reopen or a motion to supplement) are discretionary. As the court pointed out in *Castillo-Villagra,* the failure to file a discretionary motion cannot deprive this court of jurisdiction. "Since [*INS v. Doherty,* 502 U.S. 314, 323, 112 S.Ct. 719, 116 L.Ed.2d 823 (1992)] requires that motions to reopen be treated as 'discretionary,' they cannot be deemed remedies available 'as of right,' so cannot be a statutory prerequisite to judicial review." *Castillo-Villagra,* 972 F.2d at 1024. Therefore, following *Doherty* and *Castillo-Villagra,* the Alcarazes' failure to pursue those avenues cannot be a bar to jurisdiction.[4]

■■ The Alcarazes' repapering argument should also not be barred under the prudential exhaustion requirement. That requirement holds that "[e]ven if jurisdiction is not precluded by the statute, exhaustion of administrative remedies by a motion to reopen may be required as a matter of prudence in order to develop a proper record, prevent deliberate bypass of the administrative scheme, and allow the agency to correct its own mistakes." *Id.* In light of the fact that the petitioners apparently cannot now file a motion to reopen with the BIA due to untimeliness, *see* 8 C.F.R. § 1003.2(c)(2) (a motion to reopen "must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened"), the prudential exhaustion requirement does not apply. *See Castillo-Villagra,* 972 F.2d at 1024 ("The prudential exhaustion requirement does not apply where it would be futile.").

Furthermore, the Alcarazes argue that the BIA, *not the IJ,* violated its duty to consider them for the new repapering policy; the *Scialabba Memorandum* and *Cooper Memorandum* instructed the *BIA* that it "will" administratively close deportation proceedings for aliens eligible for repapering. But the BIA in this case did not do so. Necessarily, then, the Alcarazes had no higher administrative court to exhaust the BIA's alleged error.

■ Under 8 U.S.C. § 1252(g), we lack jurisdiction to consider "to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to *commence proceed-*

4. In addition, a motion to reopen is provided by regulation and not by statute; thus, we held an alien's failure to exhaust a regulatory-based remedy cannot preclude this court's jurisdiction. *Castillo-Villagra,* 972 F.2d at 1023 ("There is no statutory provision for motions to reopen, so reopening was not available to petitioners '*as of right* under the immigration *laws.*' ") (emphasis in original); *see also El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review,* 959 F.2d 742, 746 (9th Cir.1991) ("When a *statute* requires exhaustion, a petitioner's failure to do so deprives this court of jurisdiction.") (emphasis added). We have consistently held that a petitioner is not required to exhaust administrative remedies to the BIA where the remedy is optional or the BIA is not required by statute to review the motion for appeal. *Castro-Cortez v. INS,* 239 F.3d 1037, 1045 (9th Cir.2001) (petitioner not required to contest his reinstatement of deportation to the BIA before raising it on appeal to this court because the BIA is not required to reconsider its denial by statute); *Young v. Reno,* 114 F.3d 879, 881–83 (9th Cir.1997) (appeal of visa revocation to BIA is optional, not mandatory, thus appeal to BIA is not required to exhaust administrative remedies in petitioning for review of INS decision); *Wong v. Dep't of State,* 789 F.2d 1380, 1384–85 (9th Cir.1986) (request for reconsideration to authority who makes the initial decision is not generally considered procedure that must be exhausted; moreover, exhaustion would have been futile in this instance because consular official had stated that he would not reconsider revocations of visas based on lack of physical presence).

*ings,* adjudicate cases, or execute removal orders...." 8 U.S.C. § 1252(g) (emphasis added). While the second step in the repapering process involves a decision to commence (or "reinitiate") proceedings, the first step, the administrative closure of proceedings, does not implicate 8 U.S.C. § 1252(g). The Alcarazes' repapering claim only raises the issue of administrative closure. Therefore, we are not barred from hearing this claim by 8 U.S.C. § 1252(g).

Under the Administrative Procedure Act, we lack jurisdiction to review agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This jurisdictional bar "is applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (internal quotation marks omitted). While IIRIRA Section 309(c)(3), on its face, gives the Attorney General discretion, the Alcarazes' argument is that this discretion has been legally circumscribed by various memoranda through which the INS implemented its repapering policy. Under these circumstances, we find that statute is not drawn in such broad terms that there is no law to apply. *See Mendez-Gutierrez v. Ashcroft,* 340 F.3d 865, 868 (9th Cir.2003) (stating the "no law to apply" rule is applicable where there are "no statutes, regulations, *established agency policies,* or judicial decisions that provide a meaningful standard against which to assess" the agency's actions) (emphasis added).

**B.**

The government also argues that the petitioners waived the repapering issue because the Alcarazes did not raise it in their opening briefs to this court. We "will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief." *Koerner v. Grigas,* 328 F.3d 1039, 1048 (9th Cir.2003) (internal quotation marks and citations omitted). But there are "several notable exceptions to this rule, two of which apply to this case." *Laboa v. Calderon,* 224 F.3d 972, 985 (9th Cir.2000). We will review an issue not raised in an appellant's opening brief " 'if a failure to do so would result in manifest injustice.' " *United States v. Ullah,* 976 F.2d 509, 514 (9th Cir.1992) (quoting *United States v. Loya,* 807 F.2d 1483, 1487 (9th Cir.1987)). In addition, we "may review an issue [not raised in briefs to this court] if the failure to raise the issue properly did not prejudice the defense of the opposing party." *Id.*

We conclude that our failure to review the Alcarazes' repapering issue would "result in manifest injustice." *Laboa,* 224 F.3d at 985 (quoting in part *Ullah,* 976 F.2d at 514). It appears that the Alcarazes were potentially eligible for repapering when their case was before the BIA in 2001. Because the BIA may have been obligated to repaper the Alcarazes, our failure to reach this issue could result in "manifest injustice."

In addition, the government is not prejudiced by the Alcarazes' failure to raise the issue in their opening brief because after oral argument we called for and received supplemental briefs by both parties on the repapering issue. *United States v. Gamma Tech Indus., Inc.,* 265 F.3d 917, 930 (9th Cir.2001) (hearing appellants' Rule 11 claim because although the "issue was not mentioned until oral argument all parties have since discussed it and briefed it [pursuant to our order of supplemental briefing]"). Finally, the government argued the repapering issue during oral argument, after it was put on notice concerning the Alacarzes' repapering claim by the Alcar-

azes' F.R.A.P. 28(j) letter, filed one month before oral argument. *Cf. id.*

C.

It appears that the Alcarazes were potentially eligible for repapering at the time the BIA considered the IJ's decision that denied the Alcarazes' petition for suspension for deportation. The remaining issue is whether the BIA was obligated to repaper the Alcarazes pursuant to the BIA's internal policy and practice. The government contends that IIRIRA § 309(c)(3) gave the Attorney General the discretionary, *not* mandatory, authority to repaper eligible aliens. Alternatively, the government argues that it was the duty of the INS trial attorneys, and not the BIA to repaper eligible aliens. The Alcarazes argue that because the INS's repapering directives were substantive and developed pursuant to IIRIRA § 309, the INS's policy created a judicially enforceable right.

The legal proposition that agencies may be required to abide by certain internal policies is well-established. As the Supreme Court has stated: "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). "This is so even where the internal procedures are possibly more rigorous than otherwise would be required." *Id.* Courts have had occasion to recognize this principle in a variety of contexts. *Id.* at 199, 94 S.Ct. 1055 (dealing with the Bureau of Indian Affairs); *Church of Scientology of Cal. v. United States,* 920 F.2d 1481, 1487 (9th Cir.1990) (noting that "an administrative agency is required to adhere to its own internal operating procedures" and analyzing, in this framework, an IRS policy statement in the Policies of the IRS Handbook); *Nicholas v. INS,* 590 F.2d 802, 806–08 (9th Cir.1979) (dealing with an INS operations instruction); *United States v. Sourapas,* 515 F.2d 295, 298 (9th Cir.1975) (dealing with an IRS agent's failure to comply with IRS internal procedures); *United States v. Leahey,* 434 F.2d 7, 7–8 (1st Cir.1970) (dealing with "the failure of the [IRS] to follow its own published general procedure, requiring its Special Agents to give certain warnings on initial contacts with taxpayers they are investigating."); *United States v. Heffner,* 420 F.2d 809, 812–13 (4th Cir.1969) (dealing with an internal IRS policy). Although the doctrine has its clearest origin in *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), which dealt with published regulations, courts have recognized that the so-called *Accardi* doctrine extends beyond formal regulations. *See e.g., Church of Scientology of Cal.,* 920 F.2d at 1487 ("Pursuant to the *Accardi* doctrine, an administrative agency is required to adhere to its own internal operating procedures."); *Romeiro de Silva v. Smith,* 773 F.2d 1021, 1025 (9th Cir.1985) (noting that the INS can be bound by its "Operations Instructions"); *Heffner,* 420 F.2d at 812 (collecting cases and noting that, at that time, the doctrine had been applied to a Department of Interior "Order," the Army's "Weekly Bulletin 42," an FCC "rule" which had not been formally promulgated but which the court found had been the FCC's "usual practice," FCC "Standards," and a Department of Defense "Directive").

In the instant case, we decline to address whether the various memoranda issued by the agency are sufficient to establish a policy to which the agency was bound under the *Accardi* doctrine. We remand this issue to the agency for a determination in the first instance under the legal standards set forth above. Remand is appropriate given our general policy of allowing agencies to address issues in the first instance, *see INS v. Ventura,*

537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002), and is especially appropriate in this case, where the repapering issue was raised at a late stage in the proceedings. Moreover, remand is proper because further factual development regarding the nature and extent of agency statements regarding repapering may be warranted.[5]

## EQUITABLE TOLLING

The Alcarazes also challenge the BIA's final decision on the ground that they are eligible for suspension of deportation under the doctrine of equitable tolling. We, however, do not have jurisdiction to hear the Alcarazes' equitable tolling claim because they did not raise it on appeal to the BIA. Unlike their repapering claim, the Alcarazes had available to them both the factual and legal grounds for their estoppel claim when they appealed the IJ's decision to the BIA. Thus we do not consider the merits of their claim under 8 U.S.C. § 1252(d)(1).

## BIA'S CLERICAL ERROR

Finally, the Alcarazes contend that the BIA erroneously denied their application for suspension of deportation because the BIA effectively held in its decision that petitioners met the seven year physical presence requirement. Specifically, petitioners argue that they are entitled to suspension of deportation because the BIA incorrectly stated the date that the INS issued the petitioners' Order to Show Cause in their decision. The government responds that the BIA committed a clerical error by misstating the date that the INS served the Alcarazes with an OSC. We agree with the government. It is clear from the record that the Alcarazes were served with their Order to Show Cause on June 11, 1996. The BIA's decision is not reversible on the ground that it erroneously misstated the date in denying the Alcarazes' application for suspension of deportation.

## CONCLUSION

Petition **GRANTED** in part, **DENIED** in part. **REMANDED.**

5. Our decision to remand is not intended to foreclose judicial review in the future. Should the BIA find that it was not bound to repaper the Alcarazes or otherwise rule against them, the Alcarazes can again petition for review with this court.