**Fouad Youssef Hakim MANSOUR, Petitioner,**

v.

**John ASHCROFT, Attorney General, Respondent.**

**Soheir Gamil Shaker Ewada, Petitioner,**

v.

**John Ashcroft, Attorney General, Respondent.**

Nos. 02–72515, 02–72516.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 31, 2004.

Filed Dec. 6, 2004.

James R. Patterson, San Diego, CA, for the petitioners.

David Dauenheimer and Genevieve Holm, United States Department of Justice, Office of Immigration Litigation, Civil Division, Washington, D.C., for the respondent.

Before PREGERSON, BEEZER, and TALLMAN, Circuit Judges.

Opinion by Judge Beezer; Partial Concurrence and Partial Dissent by Judge Pregerson

BEEZER, Circuit Judge.

Fouad Mansour petitions for review from a summary affirmance by the Board of Immigration Appeals ("BIA") of the decision of an Immigration Judge ("IJ"). His wife, Soheir Ewada, is a derivative applicant whose petition depends exclusively on the merits of Mansour's petition. The IJ determined that Mansour had not established past persecution or a well-founded fear of future persecution. Mansour and Ewada ("Petitioners") contend that: (1) the IJ's adverse credibility finding was not supported by substantial evidence; (2) the IJ erred in concluding that Mansour had not suffered past persecution; (3) the IJ erred by not evaluating whether Mansour had a well-founded fear of future persecution; (4) the IJ erred in denying Petitioners' requests for voluntary departure; and (5) the BIA erred in affirming without opinion the decision of the IJ. We have jurisdiction under 8 U.S.C. § 1252 and we deny the petition for review in part and dismiss in part.

I

Petitioners are natives and citizens of Egypt who entered the United States as

non-immigrant tourists on November 26, 1988, and March 13, 1989 respectively. Petitioners remained in the United States beyond the departure dates fixed by their visas. Mansour and Ewada, as a derivative applicant, applied for asylum on March 31, 1998. Petitioners were served with Notices to Appear on June 3, 1998. On August 17, 1998 Petitioners conceded removability and renewed their requests for asylum and withholding of removal and requested voluntary departure in the alternative.

On October 27, 1998, Petitioners appeared before an IJ for a hearing on the merits of their case. Mansour testified that he feared persecution because as "a Coptic Christian I've been persecuted everyday [sic], mentally, maybe some physically ... I was persecuted mentally I would say on a daily basis, every day since I was a child until I came to the United States." Mansour stated that as a child he was treated differently by his school teachers because of his faith. He testified that he was struck by Arabic teachers "[w]ith a whip if he had it, if he doesn't have a whip with his hands in my face." Mansour testified that he had one Arabic teacher each year that he was in school but that not all of these teachers used physical force against him: "Some of them [ ] used force and the rest they kinda mentally persecute you and this was actually worse than hitting you with a whip or his hand." Mansour said that if he returned to Egypt he would be persecuted because he spent time in a Western country.

Ewada testified that she had been singled out and treated differently since childhood because she was a practicing Coptic Christian. Ewada said that the children at her school called her a nonbeliever and that the teachers did nothing to stop the teasing. She also stated that teachers were unwilling to provide assistance when she needed additional help with her studies. Ewada described a school system where "hitting is normal [ ] every single teacher has their own weapon." Ewada testified teachers hit her with a leather swath and slapped her numerous times. Ewada recalled one instance where she was hit by a teacher and removed from the classroom because she refused to recite Muslim prayers. She also testified that the teachers at her school would only strike Muslim children for disciplinary reasons but that Christian children were often struck for no reason. Ewada also described incidents where she was forced to run on her way to church because neighborhood children threw rocks at her. As a result of one of these incidents Ewada's brother had to seek medical attention because the children, "opened his head with a rock."

Ewada also testified regarding her fear for her two children born in the United States and her desire for them to avoid what she went through as a child in Egypt. She related her fear that her children might be killed if the family was forced to return to Egypt and that her children would not be able to live "normal" lives because of physical and mental abuse.

Mansour also testified that Coptic Christians were treated as second class citizens or worse and that people treated him differently after they found out that he was Christian rather than Muslim. Mansour described the difficulties faced by his brother who runs a grocery store in Egypt: "[M]ost of the neighbors [are] against him because there's another store in front of him and this store [is] own[ed] by a Muslim and they both do the same business ... he's taking all[my brother's] customers from him."

Petitioners both testified about the death of Ewada's cousin, a taxidriver who they alleged was killed because he was an

outspoken Coptic Christian. Ewada's cousin was described as a large man who had tattoos of the cross and Virgin Mary on his hands and chest. Mansour discussed how Ewada's cousin "felt like he had a message and wanted to give it to whoever sees him." Her cousin was murdered and his body was found by authorities in a dumpster. Ewada's cousin was buried by the authorities in a Muslim cemetery even though they likely knew that he was Christian. When Ewada's family was finally able to determine what happened to her cousin, his body was exhumed and he was properly buried in a Christian cemetery.

At the end of the hearing the IJ determined that Mansour and therefore his wife Ewada, as a derivative applicant, had not established eligibility for asylum or withholding of removal and denied them voluntary departure. A timely appeal was filed with the BIA, which summarily affirmed the IJ. Petitioners then timely filed this appeal.

**II**

■ Petitioners' appeal is governed by the permanent provisions of the Illegal Immigration Reform and Immigrant Responsibility Act because immigration proceedings were initiated after April 1, 1997. *See Kalaw v. INS*, 133 F.3d 1147, 1149–50 (9th Cir.1997). When the BIA affirms the decision of the IJ without opinion, we review the decision of the IJ as the final agency decision. *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 849 (9th Cir.2003). We review the IJ's decision that an alien has not established eligibility for asylum to determine whether it is supported by substantial evidence. *See Gonzalez–Hernandez v. Ashcroft*, 336 F.3d 995, 998 (9th Cir.2003). The IJ's determination must be upheld if " 'supported by reasonable, substantial, and probative evidence on the rec-

ord considered as a whole.' " *Li v. Ashcroft*, 356 F.3d 1153, 1157 (9th Cir.2004) (en banc) (quoting *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). "To reverse the [IJ] we must find that the evidence presented by Petitioners was such that a reasonable fact-finder would be compelled to conclude that Petitioners were persecuted or had a well-founded fear of persecution based on their [religious beliefs]." *Li*, 356 F.3d at 1157.

**III**

■ Petitioners argue that the IJ made an adverse credibility determination and that it was error for him to do so. Whether the IJ made an adverse credibility determination against Mansour is not entirely clear from the record. The IJ stated that he was "troubled by [ ] certain inconsistencies in the evidence," that Mansour's credibility was "suspect," and that there was a question raised about whether Mansour "provided false information in his asylum application and/or exaggerated some of the facts." The IJ determined that "respondent's asylum claim fails because it does not establish that he has been persecuted in the past within the meaning of the statute" and that Mansour did not present evidence that reflected whether he had a well-founded fear of future persecution if he was to return to Egypt.

■ "[T]he law of this circuit does not permit implicit adverse credibility determinations." *Shoafera v. INS*, 228 F.3d 1070, 1074 n. 3 (9th Cir.2000); *see also Manimbao v. Ashcroft*, 329 F.3d 655, 658–59 (9th Cir.2003) (noting "[w]hen the IJ makes implicit credibility observations in passing, however, this does not constitute a credibility finding"); *de Leon–Barrios v. INS*, 116 F.3d 391, 394 (9th Cir.1997) (stating that although an adverse credibility find-

ing does not require the recitation of unique or particular words, it must be explicit); *Aguilera–Cota v. INS*, 914 F.2d 1375, 1383 (9th Cir.1990) (noting that "[t]he mere statement that a petitioner is 'not entirely credible' is not enough"). "In the absence of an explicit adverse credibility finding, we must assume that [Petitioners'] factual contentions are true." *Kataria v. INS*, 232 F.3d 1107, 1114 (9th Cir. 2000).

In *Kataria*, we declined to recognize an implicit adverse credibility finding and assumed the petitioner's factual contentions to be true, notwithstanding the IJ's "concern[s] about mistakes in [the petitioner's] application" and "concerns about whether [the petitioner] was in fact a Sikh." *Id.* at 1111. The IJ's "troubles" with Mansour's and Ewada's testimony, like the "concerns" expressed by the IJ in *Kataria*, amount to nothing more than an implicit adverse credibility determination, which we have refused to recognize.[1] We will review Mansour's claim for asylum and withholding on the merits taking as true the testimony presented before the IJ.

## IV

■■■ The Attorney General may grant asylum to an alien who qualifies as a refugee, that is, one who is unable or unwilling to return to her home country " 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.' " *Melkonian v. Ashcroft*, 320 F.3d 1061, 1064 (9th Cir.2003) (quoting 8 U.S.C. § 1101(a)(42)(A)). The "heavily fact-dependent" issue of persecution can be framed as follows: "looking at the cumulative effect of all the incidents Petitioner

has suffered, [does] the treatment she received rise[ ] to the level of persecution[?]" *Singh v. INS*, 134 F.3d 962, 967 (9th Cir. 1998). Persecution is " 'the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive.' " *Prasad v. INS*, 47 F.3d 336, 339 (9th Cir.1995) (quoting *Desir v. Ilchert*, 840 F.2d 723, 726–27 (9th Cir.1988)). "[P]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive." *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir.1995). "Discrimination on the basis of race or religion, as morally reprehensible as it may be, does not ordinarily amount to 'persecution' within the meaning of the Act." *Id.* However, discrimination can in "extraordinary cases, be so severe and pervasive as to constitute 'persecution' within the meaning of the Act." *Id.* "Persecution need not be directly at the hands of the government; private individuals that the government is unable or unwilling to control can [be held to have] persecute[d] someone" for the purposes of asylum. *Singh*, 134 F.3d at 967 n. 9.

■■■ Petitioners first argue that the IJ erred by considering only whether Mansour suffered past persecution and not evaluating whether Mansour had a well-founded fear of future persecution. They point to the IJ's only specific statement explaining his denial of Mansour's application for asylum:"the Respondent's asylum claim fails because it does not establish that he has been persecuted in the past within the meaning of the statute." The government counters, arguing that the Petitioners are reading the decision too narrowly, and points to the IJ's discussion of the legal standard for a well-founded fear of future

---

1. Even if we were to hold that the IJ's statements constituted an adverse credibility determination, his various "troubles" with different aspects of the testimony of Mansour and Ewada are legally insufficient to support an adverse credibility determination.

persecution. In his decision the IJ also discussed the educational and work-status of Mansour's family members living in Egypt and what effect returning to Egypt might have on Petitioners' United States born children. This discussion, as the government properly notes, is relevant only to claims of future persecution. We hold that the IJ properly considered whether Mansour demonstrated past persecution and/or a well-founded fear of future persecution.

■ We believe that substantial evidence supports the IJ's conclusion that Mansour has not suffered past persecution. The testimony and evidence presented by Petitioners does demonstrate that Coptic Christians are subject to discrimination within Egypt on the basis of their religion. However, the evidence does not compel us to conclude that the discrimination rose to the level of persecution. As the IJ stated, Petitioners failed to establish that those that "bothered" or "mistreated" them were individuals that the government was unable or unwilling to control and noted that the relevant State Department Profile reflected the fact that Egyptian authorities have prosecuted those who have committed "acts of terrorism" against Christians. This case is similar to *Ghaly v. INS*, a case involving a Coptic Christian petitioner. 58 F.3d at 1431. There we concluded that "where private discrimination is neither condoned by the state nor the prevailing social norm, it clearly does not amount to 'persecution' within the meaning of the Act." *Id.* We recognize that in some cases discrimination may rise to the level of persecution. *See Duarte de Guinac v. INS*, 179 F.3d 1156, 1161–63 (9th Cir.1999); *Korablina v. INS*, 158 F.3d 1038, 1044–45 (9th Cir.1998). The record demonstrates that Petitioners have been the unfortunate targets of discrimination because of their religion; however, the discrimination suffered by Petitioners does not constitute persecution within the meaning of the Act.

■ Mansour has not demonstrated that he has a well-founded fear of future persecution because of his religion. "An alien's 'well-founded fear of persecution' must be both subjectively genuine and objectively reasonable." *Nagoulko v. INS*, 333 F.3d 1012, 1016 (9th Cir.2003). To satisfy the objective component, an alien must show that he has suffered from past persecution or that he has a "good reason to fear future persecution by adducing credible, direct, and specific evidence in the record of facts that would support a reasonable fear of persecution." *Id.* (quoting *Duarte de Guinac v. INS*, 179 F.3d at 1159 (9th Cir.1999)). The IJ pointed out that Petitioners have several family members who continue to live in Egypt and who have been able to obtain university educations and employment after graduation. The record does not demonstrate that Mansour has an objectively reasonable fear of future persecution.

■ Because Mansour was unable to meet his burden to demonstrate that he is eligible for asylum he necessarily fails to satisfy the more stringent standard for withholding of removal. *See Lata v. INS*, 204 F.3d 1241, 1244 (9th Cir.2000).

**V**

■ Petitioners argue that the IJ erred when he denied their request for voluntary departure on the basis that they were unable to produce current non-expired Egyptian passports. We lack jurisdiction over this issue. "The INA provides that 'no court shall have jurisdiction over an appeal from denial of a request for an order of voluntary departure . . . .' " *Alvarez–Santos v. INS*, 332 F.3d 1245, 1255 (9th Cir.2003) (quoting 8 U.S.C. § 1229c(f)).

**VI**

Petitioners argue that the BIA erred by affirming without opinion the decision of

the IJ. This argument is foreclosed by our decision in *Falcon Carriche*, 350 F.3d at 851.

## PETITION FOR REVIEW DISMISSED in part and DENIED in part.

PREGERSON, Circuit Judge, concurring in part and dissenting in part.

I concur in Parts I, II, III, and V of the majority's opinion but dissent from Part IV and from the judgment of the court. I would grant the Petition for Review because, for the reasons explained more fully below, I believe that Petitioners have established that they were persecuted in the past on account of a protected ground and, as a result, are presumptively entitled to asylum and withholding of removal.[1] Alternatively, I would hold that Petitioners are eligible for asylum because they have established an independently well-founded

---

1. *Withholding of removal* is a non-discretionary form of relief that applies to certain aliens placed in immigration proceedings after April 1, 1997, the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Withholding of removal bars the Attorney General from deporting an alien to a country where his or her "life or freedom would be threatened" on account of a protected ground enumerated in 8 U.S.C. § 1231(b)(3).

Withholding of removal sounds like, but should not be confused with, three other kinds of relief from deportation available to certain aliens: withholding of deportation, suspension of deportation, and cancellation of removal.

*Withholding of deportation* is simply the pre-IIRIRA analogue to withholding of removal. IIRIRA repealed the statutory provision establishing withholding of deportation (8 U.S.C. § 1253(h)), renamed it "withholding of removal," and codified the new "withholding of removal" provision at 8 U.S.C. § 1231(b)(3). Like withholding of removal, withholding of deportation is also a non-discretionary form of relief that bars the Attorney General from deporting an alien to a country where his "life or freedom would be threatened" on account of a protected ground. 8 U.S.C. § 1253(h) (repealed 1996). Withholding of deportation differs from withholding of removal only insofar as withholding of deportation applies to aliens who were placed in immigration proceedings *prior* to IIRIRA's April 1, 1997, effective date.

In contrast to withholding of removal and withholding of deportation, *suspension of deportation* under 8 U.S.C. § 1254(a) is a discretionary form of relief available to certain non-legal permanent resident aliens placed in immigration proceedings prior to IIRIRA's April 1, 1997, effective date if:

(1) he or she had been physically present in the United States for a continuous period of not less than seven years immediately preceding the date [he or she] filed an application for suspension of deportation; (2) he or she was a person of good moral character; and (3) deportation would result in extreme hardship to either the alien or an immediate family member who was a United States citizen or lawful permanent resident.

*Alcaraz v. INS*, 384 F.3d 1150, 1153 (9th Cir.2004).

In *Alcaraz*, we also pointed out that

[s]ection 309 of IIRIRA replaced suspension of deportation with a new form of [discretionary] relief, entitled *"cancellation of removal."* To qualify for cancellation of removal under the new statutory scheme, an alien must meet stricter eligibility requirements, including a longer period of residence (ten years) than was required under the former suspension of deportation scheme.

*Id.* (emphasis added) (comparing 8 U.S.C. § 1254(a)(1) (repealed) *with* 8 U.S.C. § 1229b(b)(1)).

Petitioners are not eligible for withholding of deportation or suspension of deportation because they were placed in immigration proceedings on June 3, 1998—well-after IIRIRA's April 1, 1997, effective date. Moreover, they are not eligible for—indeed never applied for—cancellation of removal because they are not legal permanent residents and resided in the United States less than ten years before being placed in immigration proceedings. Thus, the only relief, other than asylum, for which Petitioners may be eligible is withholding of removal.

fear that their United States citizen children will be persecuted if their family returns to Egypt.[2]

## I. Coptic Christians Are a Significantly "Disfavored Group" in Egypt.

Petitioners are Coptic Christians from Egypt. Copts are the largest Christian community in the Middle East, dating to 42 AD when Saint Mark is believed to have founded the first church in Alexandria. Nonetheless, Egypt's Coptic minority presently makes up only eight to ten percent of the country's population and has been a frequent target of discrimination and violence throughout Egypt's history. *See* Bureau of Democracy, Human Rights, and Labor, United States Dep't of State, 1997 Country Reports on Human Rights Practices: Egypt § 5(d) (Jan. 30, 1998)[hereinafter, "1997 Egypt Country Report" or "Country Report"].[3] Discrimination against Copts in Egypt dates back

to the first laws that Muslims established after the Islamic invasion of Egypt in 640 A.D.

Following the Muslim overthrow of the Byzantines, the new Muslim rulers gave non-Muslim Egyptians the choice of either converting to Islam or paying a monetary tax (the *jizyah*) to secure their "protection" for living in a Muslim state. *See* Aziz S. Atiya, *A History of Eastern Christianity* 83 (1968); Jacques Tagher, *Christians in Muslim Egypt: An Historical Study of the Relations Between Copts and Muslims from 640 to 1922*, at 36 (S. Kent Brown & Ragai N. Makartrans., 1998). Non-Muslims who paid the *jizyah* were commonly referred to as *dhimmis*. Even *dhimmis*, however, were still subjected to numerous forms of discrimination. For example, Muslims were forbidden from hiring *dhimmis* and, at times, imposed social restrictions on them, such as dictating what they

---

**2.** An alien who applies for asylum may qualify in one of two ways.

> First, the applicant can show past persecution on account of a protected ground. Once past persecution is demonstrated, then fear of future persecution is presumed, and the burden shifts to the government to show, by a preponderance of the evidence, that "there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution," or "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country." An applicant may also qualify for asylum by actually showing a well-founded fear of future persecution, again on account of a protected ground. *Deloso v. Ashcroft*, 378 F.3d 907, 913 (9th Cir.2004) (citations omitted). "Even a ten percent chance that the applicant will be persecuted in the future is enough to establish a well-founded fear." *Sael v. Ashcroft*, 386 F.3d 922, 925 (9th Cir.2004) (internal citations and quotations omitted).
>
> In contrast, "[t]he standard of proof required to establish eligibility for withholding of removal is higher than the standard for establishing eligibility for asylum." *Mihalev*

*v. Ashcroft*, 388 F.3d 722, 2004 WL 2525139, *8 (9th Cir. Nov.9, 2004). Under this higher standard, an alien is not entitled to withholding of deportation/removal unless there is "a 'clear probability'—i.e., unless 'it is more likely than not'—that he will be subject to persecution." *Lim v. INS*, 224 F.3d 929, 938 (9th Cir.2000) (citations omitted). Nonetheless, as in the context of asylum,"[a] determination of past persecution such that a petitioner's life or freedom was threatened creates a presumption of entitlement to withholding of [removal]." *Rios v. Ashcroft*, 287 F.3d 895, 903 (9th Cir.2002).

In this case, the IJ held—as does the majority, *see* Maj. Op. at 672–73—that Petitioners failed to establish that they suffered past persecution or that they have an independently well-founded fear of future persecution and assumed—as does the majority, *see* Maj. Op. at 673—that Petitioners could not meet the higher ("clear probability of future persecution") standard to prove that they are entitled to withholding of removal.

**3.** The 1997 Egypt Country Report is *available at* http://www.state.gov/www/global/human _rights/1997_hrp_report/egypt.html.

could wear. *See* Tagher, *supra,* at 36–37. Eventually, relations between Muslims and non-Muslims in Islamic countries, like Egypt, became governed by *shari'a* law. *Shari'a* "consists of a vast body of jurisprudence in which individual jurists express their views on the meaning of the Qur'an and Sunna and the legal implications of those views." Abdullahi Ahmed An–Na'im, *Human Rights in the Muslim World: Socio–Political Conditions and Scriptural Imperatives,* 3 Harv. Hum. Rts. J. 13, 18–19 (1990). Under *shari'a* law, and prior to the European law reforms of the 1850s, Copts endured second-class status in Egypt, as they were forced to give up numerous material privileges to maintain their "spiritual heritage." Atiya, *supra,* at 92.

From 1854 to the death of Egyptian President Gamal Abdel Nasser in 1970, efforts were made to equalize Copts and Muslims. *See generally* J.N.D. Anderson, *Law Reform in Egypt: 1850–1950,* in *Political and Social Change in Modern Egypt* 209, 224–27 (P.M. Holt ed., 1968); Derek Hopwook, *Egypt: Politics and Society 1945–1981* (1982). But following Mohammed Anwar El–Sadat's succession of Nasser as President, Sadat asked Egypt's national assembly to draft a constitution that recognized "the principles of Islamic *shari'a* law [as] a main source of legislation." Robert L. Maddex, *Constitutions of the World* 72 (1995).

The recognition of *shari'a* law in the Egyptian constitution foreshadowed countless violent confrontations between Egyptian Muslims and Christians. Between 1972 and 1981, when President Sadat was assassinated, there were numerous "anti-Coptic demonstrations," "widespread clashes between Muslims and Copts," and repeated burning of Coptic churches, homes, and shops. Nadia Ramsis Farah, *Religious Strife in Egypt: Crisis and Ideological Conflict in the Seventies* 2–3 (1986). Meanwhile, Islamists secured amendments to the Egyptian constitution (1) to specify Islam as the official state religion, (2) to establish "Islamic jurisprudence as the principal source of legislation," and (3) reinstate the *shari'a* as "the main" source of Egyptian legislation. *See* Maddex, *supra,* at 72.

Concerned with a possible revolution in Egypt, Sadat's successor and current President, Mohammed Hosni Murbarak has taken efforts to quell the conflict between Islamists and Copts in Egypt. *See* Anthony McDermott, *Egypt from Nasser to Mubarak: A Flawed Revolution* 196 (1988). Among other things, Murbarak has appointed Copts as ministers of his cabinet and as members of the Parliament and has allowed the Coptic Pope to celebrate Christmas with the Copts. *See* 1997 Egypt Country Report § 3; Maddex, *supra,* at 74; McDermott, *supra,* at 198–99.

Notwithstanding President Murbarak's efforts, discrimination and violence against Copts remain persistent today. For example,

> [T]he "Freedom House Report," ... published in June 1999 by the Center for Religious Freedom.... describes "mass arrests and torture" of approximately 1,000 Egyptian Coptic Christians, murders of numerous Coptic Christians on account of religion, and the arrest of the Secretary–General of the Egyptian Organization for Human Rights, all of which took place in 1998. It also details ... violent attacks against Christians who refuse to pay [the *jizyah* ], beginning in 1997.

*Malty v. Ashcroft,* 381 F.3d 942, 946 (9th Cir.2004) (quoting Center for Religious Freedom, *Egypt's Endangered Christians*

14 (Freedom House 3d ed.1999)).[4]

The above-described historical record leaves me with no doubt that Copts are a traditionally "disfavored group" in Egypt. *See Sael*, 386 F.3d at 922, 923, 925, 927, 929. Against this backdrop, I turn to Petitioners' claim that they suffered past persecution and have an independently well-founded fear of future persecution.

## II. Persecution

### A. Past Persecution

Petitioners credibly testified, as the majority properly recognizes in Part III of its opinion, *see* Maj. Op. at 671–72, that throughout their childhoods, adolescence, and young-adult years, they were subjected to acts of violence, abuse, and discrimination that similarly-situated non-Christians were not forced to endure. Petitioner Mansour summarized his experience in the following terms: "[A]s being a Coptic Christian I've been persecuted everyday, mentally, maybe some physically . . . I was persecuted mentally I would say on a daily basis, every day since I

was a child until I came to the United States." We have repeatedly held that "[p]ersecution may be emotional or psychological, as well as physical." *Mashiri v. Ashcroft*, 2004 WL 2435489, at *6 (9th Cir. Nov.2, 2004) (citing *Hernandez–Montiel v. INS*, 225 F.3d 1084, 1097–98 (9th Cir.2000); *Duarte de Guinac v. INS*, 179 F.3d 1156, 1163 (9th Cir.1999); *Kovac v. INS*, 407 F.2d 102, 105–07 (9th Cir.1969)).

In particular, Petitioners testified that they were forced to study the Koran and recite Islamic prayers at their state-run school, even though their teachers knew that they were Christian. *See Hartooni v. INS*, 21 F.3d 336, 341 (9th Cir.1994) (holding that Christian Armenians in Iran are eligible for asylum because "Iran is an Islamic Republic in which [r]eligion is almost inseparable from government." (internal quotations and citations omitted)). They were subjected to repeated physical abuse—namely, whippings and slappings—by state-employed school officials for no reason at all, while Muslim children re-

4. Evidence of country conditions submitted by Petitioners to the IJ bear out this recent unfortunate deterioration of the cultural, social, and political climate Copts are forced to endure in Egypt. For example, the 1997 Egypt Country Report states that "Christians face discrimination based on tradition and some aspects of the law;" that "[t]errorist violence against Christians is a problem" with "extremists . . . killing at least 23 Egyptian Christians;" that "[a]cts of violence were also reported against churches and Coptic-owned businesses;" that "[r]umors of church repairs or building without permits occasionally resulted in anti-Christian rioting by citizens;" and that "[s]ome Christians have complained that the Government is lax in protecting Christian lives and property." 1997 Egypt Country Report at Introduction & § 5.

Adding detail and context to the 1997 Egypt Country Report's overview of the state of affairs in Egypt, Petitioners submitted to the IJ a compendium of nineteen newspaper articles and reports from human rights organizations, each of which outlines various acts of violence and discrimination endured by Egyptian Copts in the 1990s. One such report from 1997 indicates that "[n]o month during the past twelve years has passed without the murder, beating or torture of Christians, or without their properties or churches being burned." Another 1997 report indicates that "Muslim militants demand gizia as their share of any business transaction or without provocation whether the Copt can afford to pay or not. Resistance or failure to pay results in death." According to a third report, "[t]he Muslim Militant strategy of collecting the gizia is a religiously sanctioned method of purifying their country of infidels." Yet another reports that "Copts fear approaching the police for assistance and protection because they see the largely Muslim police forces of Egypt clandestinely approving of the situation through their failure to address a situation that they know exists and know how to solve."

ceived such abuse for only disciplinary reasons. *See Osorio v. INS,* 99 F.3d 928, 930 (9th Cir.1996) (holding that beatings in school at behest of teacher are evidence of past persecution).

Petitioners also described their community as one in which the local authorities refused to avert or to investigate private acts of violence and discrimination directed toward Christians in general and Petitioners in particular. For example, on an almost weekly basis, Ewada was assaulted with rocks by neighborhood children as she walked to her church because she was a known Christian and wore a cross, but received no assistance from the authorities. *Cf. Lopez–Galarza v. INS,* 99 F.3d 954, 957 (9th Cir.1996) (holding that frequent stonings of one's house can be an important aspect of establishing past persecution). On one such occasion, Ewada's brother required medical attention because the children "opened his head with a rock." Similarly, when Ewada was nineteen or twenty years-old, her cousin, a taxi-driver who had tattoos of the cross and Virgin Mary on his hands and chest and had "Jesus" stickers on his taxi, was murdered, allegedly by Muslims because of his outspoken views about his faith. Even though his Christian tattoos were plainly visible on his body, the authorities buried him in a Muslim cemetery without notifying his family of his death. Finally, Mansour testified that when his car was vandalized and he reported it to the police, he received insufficient assistance because his identification card identified him as a Christian. *See Mashiri,* 2004 WL 2435489 at *6 (acknowledging vandalism of the petitioner's car as relevant to establishing persecution); *Sael,* 386 F.3d at 924, 927 (same).

I part ways with the majority inasmuch as I believe that the harms suffered by Petitioners transcend mere "discrimination" and rise to the level of persecution— in particular, because they occurred in the context of widespread discrimination against Coptic Christians and because Petitioners are members of a "disfavored group" in Egypt. Even *Ghaly v. INS,* 58 F.3d 1425 (9th Cir.1995), which the majority describes as "similar" to the instant case, Maj. Op. at 673, recognized that the BIA has held that "severe and pervasive" discrimination can constitute persecution in certain "extraordinary cases," *Ghaly,* 58 F.3d at 1431 (citing *Matter of Salama,* 11 I. & N. Dec. 536 (BIA 1966)); *see also El Himri v. Ashcroft,* 378 F.3d 932, 937 (9th Cir.2004) (granting withholding of removal based on severe economic discrimination that stateless Palestinians born in Kuwait would face). Moreover, it is well-settled that the cumulative effect of harms and abuses, which considered individually may not rise to the level of persecution, may nonetheless support a claim for asylum or withholding of removal. *See, e.g., Baballah v. Ashcroft,* 367 F.3d 1067 (9th Cir. 2004) (holding that the cumulative effect of harassment, threats, violence, and discrimination against an Israeli Arab and his family amounted to persecution). For example, in *Korablina v. INS,* 158 F.3d 1038 (9th Cir.1998), we distinguished discrimination from persecution and "reversed the BIA's decision that the petitioner had experienced a serious form of discrimination on account of her Jewish heritage, but had not established persecution." *Duarte de Guinac,* 179 F.3d at 1161 (citing *Korablina,* 158 F.3d at 1044). Our "holding that Korablina had, in fact, suffered persecution relied on the cumulative effect of several instances of violence and harassment directed toward the petitioner by Ukrainian ultra-nationalists." *Id.* at 1162 (citing *Korablina,* 158 F.3d at 1044). Specifically, "Korablina testified that she witnessed repeated violent attacks and experienced one such attack herself, all of which were moti-

vated by an ultra-nationalist hatred of Jews." *Id.* (citing *Korablina,* 158 F.3d at 1044).

Of particular relevance to the instant case, "Korablina's [experiences] occurred in the context of widespread discrimination against individuals who possessed a particular 'offensive' characteristic. This context strengthened, rather than weakened, her claim of persecution." *Id.* (discussing *Korablina* and citing *Singh v. INS,* 94 F.3d 1353, 1358 (9th Cir.1996) (holding that the BIA erred by disqualifying Singh from asylum eligibility merely because other Indo–Fijians were subject to the same discrimination, harassment, and violence)).

Here, Petitioners experiences, like Korablina's,"occurred in the context of widespread discrimination," *id.,* against a "disfavored group" of individuals, *Sael,* 386 F.3d at 923, 925, 927, 929, "who possessed a particular 'offensive' characteristic," *Duarte de Guinac,* 179 F.3d at 1162— namely, being Christian. On the basis of Petitioners' credible testimony about the repeated discrimination, harassment, and

violence that they endured in the context of widespread discrimination, harassment, and violence in Egypt against Coptic Christians, I would conclude that Petitioners have suffered past persecution and are entitled to the rebuttable presumption that they will suffer future persecution if returned to Egypt. *See Wang v. Ashcroft,* 341 F.3d 1015, 1021 (9th Cir.2003).[5]

I also believe that, because the majority of the harms suffered by Petitioners occurred when Petitioners were children, their claims are even stronger than they would be if Petitioners suffered the same harms while adults. As several commentators have recognized, the fact that some asylum-seekers were harmed while children is central to their claim for relief because "behavior that might not qualify as persecution when targeted at adults may rise to ... persecution when applied to children." Jacqueline Bhabha & Wendy A. Young, *Through a Child's Eyes: Protecting the Most Vulnerable Asylum Seekers,* 75 Interpreter Releases 757, 761 (June 1, 1998); *see also id.* at 762 ("Actions that

---

5. I also disagree with the majority's conclusion that the harms "suffered by Petitioners do[ ] not constitute persecution within the meaning of the [Immigration and Nationality] Act" because the harms are " 'neither condoned by the state nor the prevailing social norm.' " Maj. Op. at 673 (quoting *Ghaly,* 58 F.3d at 1431). Much of the abuse on which Petitioners base their claims was administered by teachers at Petitioners' *state*-run schools. Moreover, even if one could properly characterize all of the harms suffered by Petitioners as coming exclusively at the hands of private actors—a characterization with which I strongly disagree—any such conclusion is inconsistent with our prior precedents recognizing that "persecution by the[ ] government or forces that the[ ] government is unable or unwilling to control" renders petitioners eligible for relief. *Malty,* 381 F.3d at 947. Indeed, in *Malty,* a case involving a Christian Copt from Egypt, we recognized explicitly that Islamic discrimination and violence against Egyptian Copts are part of a

"pattern and practice of persecution" that the Egyptian government is "either unwilling or unable to control." *Id.* at 948(granting the petition for review and remanding with instructions for the BIA to reopen the case to consider changed conditions in Egypt because "there is no question that [the petitioner] demonstrated a reasonable likelihood of meeting [the ten percent chance of future persecution] standard" and "stated a prima facie case for asylum based on changed circumstances in his country of nationality."); *cf. also Tawadrus v. Ashcroft,* 364 F.3d 1099, 1101, 1106 (9th Cir.2004) (recognizing that Egyptian Coptic Christian petitioner had "potentially viable" asylum claim based on "economic sanctions" by "members of certain government-controlled agencies" "for failing to convert to Islam"). I believe that the historical record clearly establishes that the Egyptian government is unwilling or unable to control private violence and discrimination against its Coptic population.

might be considered· mere harassment or interference when directed at adults could amount to persecution when applied to children."); Geraldine Sadoway, *Refugee Children Before the Immigration and Refugee Board,* 35 Immigr. L.Rev. (2d) 106, 110 ("Harmful actions against adults that might be considered as mere harassment or discrimination in the case of an adult may constitute persecution when applied to children."). Even the former-INS has recognized that "[t]he harm a child fears or has suffered ... may be relatively less than that of an adult and still qualify as persecution. Given the 'variations in the psychological make-up of individuals and in the circumstances of each case, interpretations of what amounts to persecution are bound to vary.'" Memorandum from Jeff Weiss, Acting Director, INS Office of International Affairs, "Guidelines for Children's Asylum Claims" [hereinafter "Weiss Memorandum"] 120/11.26, at 19 (Dec. 10, 1998), *reproduced in* 76 Interpreter Releases 1 (Jan. 4, 1999) (quoting Office of the United Nations High Comm'r for Refugees ("UNHCR"), Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees [hereinafter "UNHCR Handbook"] ¶ 52, *revised by* U.N. Doc. HCR/IP/4/Eng/REV.1 (1992)).[6] Put another way,

"persecution could arise because of the child's heightened sensitivity.... As a demographic category, children are more likely to be traumatized by hostile situations because of their age, lack of maturity, and vulnerability."[7] Bhabha & Young, *supra,* at 762 (footnote omitted); *see also* Weiss Memorandum, *supra,* at 21("[T]he inherent vulnerability of children often places them at the mercy of adults who may inflict harm without viewing it as such, sometimes to such a degree of severity that it may constitute persecution."). For example, conscription as a soldier, *see Gonzalez v. INS,* 82 F.3d 903, 908(9th Cir.1996); some forms of minor physical abuse, *Prasad v. INS,* 47 F.3d 336, 339–40 (9th Cir.1995); some forms of short-term forced labor, *Khup v. Ashcroft,* 376 F.3d 898, 903 (9th Cir.2004); or arranged marriage, *see Adams v. Canada,* [2003] F.C. 386, 2003 CarswellNat 848, while unfortunate and deplorable, may not constitute persecution if imposed on an adult. Under international law, however, such impositions rise to the level of persecution if directed at a child because they implicate a child's fundamental human rights and "lead to consequences of a substantially prejudicial nature." UNHCR Handbook, *supra,* at ¶ 54.[8] To this end, the Executive Committee of the Office of the UNHCR

**6.** The Weiss Memorandum is *available at* http://uscis.gov/graphics/lawsregs/handbook/10a—ChldrnGdlns.pdf. The UNHCR Handbook is *available at* http://www.unhcr.ch/cgi-bin/texis/vtx/home/opendoc.pdf?tbl=MEDIA & id=3d58e13b4 & page=publ.

**7.** "[P]ersecution could[also] arise because of the child's heightened dependence. Children have particular needs for assistance and protection." Bhabha & Young, *supra,* at 763. To this end, the UNHCR "stated that children and adolescents are entitled to special attention because their needs, and their social and legal status, can be significantly different from those of adults, and from each other as well, due to age-related developmental differences." Weiss Memorandum, *supra,* at 3–4(citing UNHCR Policy on Refugee Children, EC/SCP/82 (Aug. 6, 1993)).

**8.** Although the UNHCR Handbook of its own force is not legally binding, the Supreme Court has characterized it as a source of useful guidance in adjudicating asylum claims, *see INS v. Cardoza–Fonseca,* 480 U.S. 421, 439 n. 22, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), and we have recognized that "we are guided by [its] analysis," *Zhang v. Ashcroft,* 388 F.3d 713, 2004 WL 2521299, *6 (9th Cir. Nov.9, 2004).

has condemned the exposure of children to "physical violence and other violations of their basic rights." Conclusions on the International Protection of Refugees adopted by the Executive Committee of the UNHCR Programme, No. 47 (XXXVI-II) on Refugee Children (1987).[9] Likewise, the 1989 Convention on the Rights of the Child ("CRC") articulates a wide range of children's rights and substantive obligations imposed on states to protect children.[10] *See generally* Convention on The Rights of The Child, Nov. 20, 1989, 28 I.L.M. 1448. Among other obligations, the CRC requires states to protect children from physical or mental abuse, maltreatment, and exploitation. *See id.* art. 19, 28 I.L.M. at 1463 (directing states to "protect the child from all forms of physical or mental violence, injury or abuse, neglect or negligent treatment, maltreatment or exploitation, including sexual abuse, while in the care of parent(s), legal guardian(s) or any other person who has the care of the child").

I have little doubt that, under the international legal standards discussed above, the international legal community would conclude that the harms inflicted on Petitioners while they were children in Egypt amount to persecution and entitle them to relief from removal. I see no reason why our court should not reach the same conclusion. *See, e.g.*, Deborah E. Anker, *Law of Asylum in the United States* 173–74 (3d ed. 1999) ("[I]nternational human rights standards should ground asylum adjudicators' assessments of relevant individual rights and consequent state duties."); *see also* Basic Law Manual, *supra*, at 24 ("One must determine whether the conduct alleged to be persecution violates a basic human right, *protected under international law*." (emphasis added)). The Immigration and Nationality Act does not define "persecution." The definition of persecution that our court applies is a creature of purely our own case law. "Absent a statutory definition, [we have] defined persecution as 'the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive.'" *Khup v. Ashcroft*, 376 F.3d 898, 903 (9th Cir.2004) (quoting *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir.1996) (en banc)). Application of a singular definition of persecution to both adult- and child-based claims fails to address adequately the fact that suffering or harm inflicted on children is far more "offensive" than identical suffering or harm inflicted on adults. *See, e.g.*, Anker, *supra*, at 171–74 (noting that the term "persecution" was designed by the UNHCR to be "open-ended and flexible, subject to interpretation according to evolving standards"). Thus, when a

9. Executive Committee Conclusion No. 47 is *available at* http://www.unhcr.ch/cgi-bin/texis/vtx/home/opendoc.htm?tbl=EXCOM & id=3ae68c432c & page=exec.

10. "Despite its relative newness, more countries have ratified the CRC than any other human rights treaty. Unfortunately, the U.S. is one of only two countries that have not endorsed it." Bhadda & Young, *supra*, at 758 (footnotes omitted). Nonetheless, the United States' failure to ratify the Convention is of little moment because the rights of children and the obligation to protect refugee children whose rights have already been violated is "an obligation that is already binding on the U.S. under the [1951] Convention and [1967] Protocol [Relating to the Status of Refugees]," *id.*, and "[h]aving signed [but not ratified] the CRC ... the United States is obliged under international treaty law to refrain from acts which would defeat the objectives and purpose of the Convention," Weiss Memorandum, *supra*, at 2 n. 2. Moreover, the INS itself recognizes that, "even if the U.S. has not ratified a particular treaty, it may still be bound if the treaty has acquired the status of customary international law." Bhadda & Young, *supra*, at 760 (citing INS, Basic Law Manual 12–13; 24 (Nov.1994)).

petitioner's claim for relief from removal is based on harms suffered while the petitioner was a child, our definition of what constitutes persecution should be reflective of children's unique vulnerability.

## B. Future Persecution

The majority concludes that Petitioners do not have an objectively reasonable fear of future persecution because "Petitioners have several family members who continue to live in Egypt and who have been able to obtain university educations and employment after graduation." Maj. Op. at 673. I believe that the majority's focus on Petitioners' adult family members' experiences in Egypt fails to appreciate the crux of Petitioners' future persecution claim. See Rios, 287 F.3d at 902 ("[A] petitioner's family's continued safety does not rebut the petitioner's well-founded fear of future persecution when there is no evidence that the family is similarly situated or subject to similar risk, and nothing in the record supports an inference that their safety ensures that [the alleged targets of the persecution] will be safe." (emphasis added; quotation marks and citation omitted)). The crux of Petitioners' future persecution claim is that, if their family is forced to return to Egypt, their school-aged United States citizen children will be forced to endure suffering and harm similar to the suffering and harm Petitioners endured while school-aged children in Egypt.[11] In support of their claim, Petitioners testified that they still communicate with family members in Egypt with school-aged children. From those family members, Peti-

tioners have learned that Egypt's school systems have become increasingly hostile to Christians since Petitioners left Egypt in 1988. Thus, they fear that, at minimum, "[t]he[ir children] will be hit[ ], they will be mentally abused everyday," and that, even worse, their children may be killed because of the family's religious beliefs and practices.

Whether aliens in removal proceedings may assert a derivative claim for relief from removal on behalf of their U.S. citizen children is an open question in this Circuit. See Azanor v. Ashcroft, 364 F.3d 1013, 1021 (9th Cir.2004) (remanding to the BIA to consider whether an individual could assert a derivative Convention Against Torture claim on behalf of U.S. citizen children, which we noted presented an issue of first impression in this Circuit). But as our colleague, Judge Ferguson, persuasively reasoned after surveying Supreme Court and out-of-circuit precedent and various United Nations documents, this is a question that should be answered in favor of recognition of such a derivative claim. See Abebe v. Ashcroft, 379 F.3d 755, 760–64 (9th Cir.2004) (Ferguson, J., dissenting); cf. also Nwaokolo, 314 F.3d at 308 (granting stay of removal pending review of denial of motion to reopen based on assertion that petitioner's U.S. citizen daughter would face torture if forced to accompany petitioner to Nigeria). I share Judge Ferguson's view and would hold that Petitioners may derivatively claim relief from removal because they have a well-founded fear that their U.S. citizen children will be persecuted if Petitioners

---

11. That Petitioners' children are not formally subject to the BIA's removal order is irrelevant to Petitioners' derivative claim on behalf of their U.S. citizen children. As the Seventh Circuit has held, "when an alien minor's parents are deported, the minor 'will have to follow his parents into exile ... he is con-

structively deported and should therefore ... be entitled to ask—or more realistically his parents' lawyer should be entitled to ask on his behalf—for [relief].' " Nwaokolo v. INS, 314 F.3d 303, 307–08 (7th Cir.2002) (per curiam) (quoting Salameda v. INS, 70 F.3d 447, 451 (7th Cir.1995)).

and their family are forced to return to Egypt.

Turning to the substance of Petitioners' derivative future persecution claim, I would find that Petitioners have satisfied the applicable standard. We have repeatedly held that "[a] well-founded fear does *not* require proof that persecution is more likely than not; even a ten percent chance of persecution may establish a well-founded fear." *Malty*, 381 F.3d at 948 (emphasis in original) (citing *Cardoza–Fonseca*, 480 U.S. at 440, 107 S.Ct. 1207; *Al–Harbi v. INS*, 242 F.3d 882, 888 (9th Cir.2001)); *see also, e.g., Sael*, 386 F.3d at 925. We have also repeatedly held that when petitioners are members of a group that is "significantly disfavored," they must demonstrate an even lower level of individualized risk to prove a well-founded fear of future persecution. *Sael*, 386 F.3d at 927("Because the record establishes that ethnic Chinese are significantly disfavored in Indonesia, Sael must demonstrate a 'comparatively low' level of individualized risk in order to prove that she has a well-founded fear of future persecution." (quoting *Hoxha v. Ashcroft*, 319 F.3d 1179, 1184 (9th Cir.2003))); *see also Mgoian v. INS*, 184 F.3d 1029, 1035 n. 4 (9th Cir.1999); *Singh*, 94 F.3d at 1359; *Kotasz v. INS*, 31 F.3d 847, 853–54 (9th Cir.1994). In other words, when immigration petitioners are members of a "disfavored group," "the less individualized the threat of persecution needs to be" because the threat they face

is "more serious and widespread." *Sael*, 386 F.3d at 925(citations and quotations omitted).[12] I believe that Petitioners easily satisfy this standard.

The crux of Petitioners' future persecution claim is that they fear their children will be subjected to the very harms and suffering that Petitioners suffered themselves as school-aged children in Egypt. There is no evidence in the record that discrimination against Copts in Egypt is any less widespread than it was before Petitioners fled to the United States. Like-wise, there is no evidence that Copts are any less likely to be the targets of violence and abuse than when Petitioners lived in Egypt. To the contrary, the evidence in the record and Petitioners' credible testimony strongly suggest that Copts—Petitioners' children, in particular—may be at greater risk to suffer violence and abuse and more frequently subject to discrimination than before Petitioners left Egypt. Of particular relevance to Petitioners' claim that they fear that their children will be persecuted in Egypt, Petitioners' credible testimony that the Egyptian school system has become increasingly hostile to Christians stands unrefuted by any other evidence.

On this record, I would conclude that Petitioners have an independently well-founded fear that their children will be persecuted if the family is forced to return to Egypt.[13] Moreover, just as Petitioners'

12. This approach to evaluating *future* persecution claims is akin to the approach we apply to *past* persecution claims, *see supra* Part II(A), under which past harms and abuses "occurr[ing] in the context of widespread discrimination against individuals who possessed a particular 'offensive' characteristic .... strengthen[ ], rather than weaken[ ], claim[s] of [*past*] persecution." *Duarte de Guinac*, 179 F.3d at 1162 (citations omitted).

13. As noted earlier, the IJ held that Petitioners failed to prove their eligibility for asylum

and assumed—as does the majority, *see* Maj. Op. at 673—that Petitioners could not meet the higher ("clear probability of future persecution") standard to prove that they are entitled to withholding of removal. *See supra* note 2. Rather than apply the withholding standards to the evidence myself, I would remand the issue of withholding of removal so that the IJ may apply the law to the facts in the first instance. *See Mashiri*, 2004 WL 2435489, at *9 (citing *Jahed v. INS*, 356 F.3d 991, 1001 (9th Cir.2004)).

past persecution claim is strengthened by the fact that much of the abuse on which they base it occurred when Petitioners were children, *see supra* Part II(A), I believe that Petitioners' future persecution claim is strengthened by the fact that the likely targets of the future persecution they fear are their vulnerable school-aged children.

## III.  Conclusion

I believe that Petitioners suffered past persecution on account of their Christian beliefs. I would find that they are presumptively entitled to asylum and withholding of removal. In my view, Petitioners' claims are strengthened by the fact that much of the abuse on which they base their claim occurred when they were children. Likewise, I believe that Petitioners have an independently well-founded fear that their U.S. citizen children will be persecuted if the family is forced to return to Egypt.

Accordingly, I would grant the petition for review and respectfully dissent from Part IV of the majority's opinion and from the judgment of the court.