**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 20, 2009

Charles R. Fulbruge III
Clerk

No. 08-50770

APS CAPITAL CORP.

Plaintiff-Appellant

v.

MESA AIR GROUP INC.

Defendant-Appellee

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, SMITH, and SOUTHWICK, Circuit Judges.
PATRICK E. HIGGINBOTHAM, Circuit Judge:

This contract case, governed by Texas law, comes to us on appeal from summary judgment in favor of Mesa Air Group. APS argues that the district court erred in finding an enforceable contract on summary judgment, and in its award of damages.

I

Mesa Air Group is a regional airline that, in the course of Delta Airline's bankruptcy proceedings in the Southern District of New York, was

awarded an unsecured trade claim[1] with a face amount of $35 million against Delta. APS Capital Corporation's business is the purchase and resale of trade claims and bank debt. After Mesa's claim against Delta was approved by the bankruptcy court, APS contacted Mesa regarding possible sale of Mesa's claim to APS. After several weeks of intermittent contacts, discussions came to a head on April 20, 2007, a Friday. Steven Kleckner, an APS employee who was charged with pursuing trade claim purchases and had initiated contacts with Mesa, spoke several times that day with George Murnane III, Executive Vice President and Chief Financial Officer of Mesa. In these phone conversations, transcripts of which are in the record, APS informed Mesa that it could offer a relatively good price (58 cents on the dollar),[2] on the entire face value of Mesa's claim (35 million dollars), and the parties reached an agreement on the transaction at that price.[3] At 2:58 pm CST that afternoon,

---

[1] "There is a market for the purchase and sale of claims held by creditors against debtors in bankruptcy . . . . It is sometimes referred to as the 'trade claim industry' or 'trade claim market.' Normally, a purchaser of a claim . . . pays a percentage of the face value of a claim as the purchase price. The purchaser is betting that he is paying less for the claim than will ultimately be paid out by the bankruptcy court, or that he can sell it to a third party for a higher price prior to the confirmation of the liquidation plan in the bankruptcy court." *Bear Stearns Inv. Prod. v. Hitachi Auto. Prod. (USA)*, 401 B.R. 598, 604 (S.D.N.Y. 2009) (internal citations omitted). An APS expert, Jason M. Alper, provided a discussion of trade claims and their "impairment" in his report: "Even those [trade] claims that are undisputed, acknowledged and/or allowed by the debtor can be subject to a number of defenses and actions by the debtor in court or they can simply be amended. The notional amount of any given trade claim can change at any given time for a multitude of reasons."

[2] Record evidence suggests that the next highest bidder at that time was Goldman Sachs, which had offered $57.75 on the dollar, which would have yielded a difference of approximately $87,500 of the total purchase price.

[3] APS routinely records its employees' phone calls with clients, and transcripts of the calls are in the record. The final call, at 3:06 pm on April 20, involved APS's Murnan and Mesa's Kleckner, and ran in relevant part:

APS sent an e-mail confirming the agreement. The e-mail came from Steven A. Klenda, General Counsel of APS, and its substance ran as follows:

> Please allow this e-mail to serve as a preliminary confirmation of our Delta Airlines, Inc. (the "Debtor") transaction with a trade date of April 20, 2007. You have verbally agreed to sell approximately $35,000,000.00 face amount ("Purchase Amount") general unsecured claims against the Debtor at fifty eight cents on the dollar (or 58% of the Purchase Amount).
>
> Given the lateness of the hour here, I will follow-up on Monday with a formal written trade confirmation with customary terms that will memorialize the key terms of this transaction and provide for the negotiation and execution of a more extensive purchase-and-sale/assignment agreement.

On Tuesday, April 24, APS transmitted the promised "draft formal transaction confirmation" as an e-mail attachment, with Klenda noting in his accompanying e-mail that he "did not have the time today to draft [the agreement] personally or give it more than a cursory review," encouraging Mesa to "review it in this light," and asserting, "[w]e look forward to working with you moving this transaction toward completion."

In addition to confirming the details already agreed upon (a "trade date" of April 20, the identity of buyer and seller, the price and assets involved), the document included some significant terms that Mesa objected to—certain warranty, risk-shifting, and indemnification provisions; a lengthy closure deadline; and a previously-undiscussed condition precedent to the

---

MR. MURNANE: Hi. Okay we're done at 58.
MR. KLECKNER: 58?
MR. MURNANE: Yep.
MR. KLECKNER: Alright, well in that case I will get you a confirm over shortly–
MR. MURNANE: Okay.

transaction: APS's finding a third-party buyer for the claim it was to purchase from Mesa. On April 26, through outside counsel, Mesa responded with a draft of its own, removing or modifying the objectionable provisions. Some language was consistent across both drafts, including multiple provisions to the effect that until the transaction actually was funded and closed, the agreement was non-binding and the transaction would be "null and void."[4]

The next afternoon, APS responded, with a new tone. Citing "Mesa's deletion of material terms" from the proposed agreement, APS rejected the Mesa draft and then effectively walked away from the negotiating table, rejecting any future dealing on what it characterized as the "nascent transaction," declaring it "null and void." Further efforts failed to bring APS back to the table, and Mesa's counsel finally warned, late that afternoon: "APS can expect litigation in this matter." On Monday, April 30, 2007, the next business day after Mesa so advised, APS brought suit in the Western District of Texas, seeking relief under the Texas and Federal Declaratory Judgment Acts.[5] Mesa counterclaimed on breach of contract and promissory estoppel grounds.

---

[4] The "Binding Effect" provision ran thus:
EACH OF THE PARTIES HERETO EXPRESSLY AGREE AND ACKNOWLEDGE THAT THIS TRANSACTION SHALL NOT BECOME A LEGAL, BINDING AND ENFORCEABLE COMMITMENT UNTIL THE PARTIES EXECUTE AND DELIVER A PSA [Purchase and Sale Agreement] THAT IS ACCEPTABLE TO BUYER.

[5] Jurisdiction is grounded in diversity. Mesa is a Nevada corporation with its principal place of business in Phoenix, and APS is a Delaware company with its principal place of business in Austin.

On April 11, 2008, Judge Sparks decided the parties' cross-summary judgment motions in favor of Mesa, holding as a matter of law that the parties formed an enforceable contract on April 20, which was breached by APS's final repudiation of the deal on April 27, 2007. Damages were argued at a bench trial, and the court ultimately awarded Mesa $1,545,379 in damages, plus interest and attorneys' fees. The court reasoned that the phone calls and the e-mail unambiguously indicated an intent to be bound to all necessary terms in the transaction—what was being sold, the purchase price, and the date of sale—and that as such the communications recorded an enforceable contract between the parties.

A number of aspects of the district court's ruling are not challenged on appeal, including its rulings as to the inapplicability of the statute of frauds, APS's affirmative defenses, and numerous aspects of his damages ruling, including the adequacy of Mesa's mitigation. The remaining disputes are over (1) the existence of a binding agreement, and (2) the date of the breach, which is relevant to damages. We turn first to the decisive issue of whether there was, as a matter of law, a binding contract made between the parties.

II

We review two aspects of the district court's finding of a binding contract: first, whether the parties intended their April 20 agreement to be binding; and, if so, whether the agreement on April 20 was sufficiently definite to be an enforceable contract.

A

There is no doubt but that the parties achieved some agreement on April 20, memorialized in the e-mail of that afternoon. The parties dispute

whether it was an enforceable contract with some customary terms to be supplied, or an agreement on a central price point only, with further negotiation over other key terms to follow.

APS advances the latter position, characterizing this as a case in which an "agreement to agree" went awry in the course of ongoing negotiations; by contrast, with an able district court on its side, Mesa characterizes this as a straightforward breach of contract, in which APS sabotaged what should have been the routine formalization of an already-agreed-upon contract with an unfair addition of terms followed by a precipitous exit from the negotiating table. In our de novo review of summary judgment,[6] we may only decide this dispute if there is no genuine issue of fact material to the answer. If the matter cannot be decided as a matter of law, we must remand for fact-finding.

The parties' intent to be bound is the salient issue. The district court held that "[d]espite the parties' continued negotiation of the language for additional terms in a formal written instrument, the only objective evidence regarding the intent and purpose of the April 20, 2007 e-mail clearly and unambiguously indicates that an offer was made and accepted and a contract was formed." It cited language in the e-mail from APS that Mesa had "verbally agreed" to the deal, and the absence of any language indicative of a desire *not* to be bound (an agreement "subject to" other terms; an explicit "non-binding" provision, etc.), as conclusively evidencing an intent to be bound. Given this clarity, the court refused to look at the later, "formal" contract drafts, which included repeated and sometimes all-capitalized

---

[6] The district court bifurcated liability and damages. After its grant of summary judgment to Mesa on liability the parties agreed to a bench trial on damages.

language specifying that the parties' agreement was not binding unless it actually closed. It reasoned that these after-the-fact communications might express some of the parties' subjective understandings of the status or nature of the transaction, but that subjective understandings cannot, as a matter of law, controvert the unambiguous objective evidence in favor of finding a binding agreement as of April 20.

Several circumstances give pause. First, there is the language used in the phone calls and e-mails of and before April 20. Certainly, these communications could support a finding that the parties intended their agreement to be a binding contract. But, as APS points out, some of the language points in the opposite direction—namely the inclusion of "preliminary" in the phrase "preliminary confirmation," and the fact that the draft to be transmitted would "provide for the negotiation and execution of a more extensive purchase-and-sale/assignment agreement." These bits of language stand in tension with the language that suggests intent to be bound. Negotiations can fail, and preliminary confirmation of a deal may never be finally confirmed. This reading may be weaker than the district court's, but ambiguity may arise even when two conflicting interpretations are not equally plausible, so long as both are reasonable in light of the evidence.

Nor does the absence of language providing that this agreement was "subject to" further negotiation or otherwise not binding sound clearly against APS. The case most heavily relied on by the district court on this point, *John Wood Group USA v. ICO*,[7] does not carry the district court's weight. True, *John Wood* warned in rather sweeping normative terms that parties might

---

[7] 26 S.W. 3d 12, 14 (Tex. App.—Houston [1st dist.], 2000).

find themselves bound unless they specifically included language clarifying the non-binding nature of a given "agreement." But this warning came in dicta, as the *John Wood* court ultimately found as a matter of law that there was *not* an intent to be bound to the contract at issue,[8] and the case does not support the notion that borderline agreements should as a matter of course be held to be binding unless such language is included. The preponderance of the case law clarifies that *John Wood* does not require non-binding language as a per-se rule or even as a general principle.[9] Rather, the thrust is that in the absence of such language a party may hazard being bound.[10]

The language of a contract must be read in the light cast by industry practice in which it arises. It is true that negotiations up to April 20 centered wholly on the central price term, and in most sales contexts, agreement as to the parties, the assets, and the price term would suffice—although even in sales of goods, issues such as date of closure and of payment, and other

---

[8] Indeed, not a single case cited on this issue in *John Wood* involves a finding that there was a contract as a matter of law: either courts sent the issue to a jury, or found that there was no contract as a matter of law.

[9] *See, e.g., Foreca, S.A. v. GRD Dev. Co., Inc.*, 758 S.W. 2d 744 (Tex. 1988) (holding that an agreement that said it was "subject to legal documentation," was ambiguous as to the issue of intent to be bound, and leaving the issue for a jury); *H.L. Scott v. Ingle Bros. Pac., Inc.*, 489 S.W. 2d 554 (Tex. 1972) (leaving issue to the fact-finder; collecting weighty authority in support of the doctrine that there may be a contract even before formalization, but that this determination is usually a fact issue); *Texaco v. Pennzoil*, 729 S.W. 2d 768, 790 (Tex. App.—Houston [1st dist.] 1987) ("Regardless of what interpretation we give to the conditional language in the press release, we conclude that it did not so clearly express the intent of the parties not to be bound to conclusively resolve that issue," which was thus left to the jury). Note that *John Wood* referred to *Foreca* as "[t]he leading case on whether 'intent to be bound' presents a fact question or a question of law . . . ." *John Wood*, 26 S.W. 3d at 16.

[10] Both of the cases cited in *John Wood* directly after the language quoted by the district court here are cases in which the issue was sent to a fact-finder.

warranties and indemnifications would likely be arranged when over twenty million dollars were involved. Mesa's case is strengthened by the fact that in a rapidly fluctuating market, "locking in" a binding agreement at a given rate is intuitively a fair and advisable practice.[11] But as APS urges, agreement as to central, carefully negotiated terms in a time-sensitive context need not lead to a contract, when complex, high-value assets such as trade claims are at issue.

Yes, an enforceable contract requires a "meeting of the minds"—but not every "meeting of the minds" is a contract. The minds may not have met on all essential terms. The question of indefiniteness—whether an agreement reaches all essential terms of a given transaction—is one of law for the court.[12] We examine that question in greater detail later. That said, determining intention may require resolution of ambiguities and face a want of specificity, clouding the clarity of the distinction between the legal question of indefiniteness and the fact question of intention.

In light of the business context of this transaction and the communications exchanged between the parties, a trier of fact could decide either way on the question of whether the e-mail included an implication that this was a binding agreement that would be supplemented by customary terms as a mere formality, or whether in this type of business these

---

[11] Mesa's introduction of documents produced by the Loan Syndication and Trading Association provides some indication of this, although the fact that this is the strongest evidence it could produce on the point reaffirms our view that this must be considered an unsettled fact issue at this point.

[12] *COC Svcs., Ltd. v. COMPUSA, Inc.*, 150 S.W. 3d 654, 664 (Tex. App.—Dallas 2004) ("Whether an agreement fails for indefiniteness is a question of law to be determined by the court.").

sophisticated parties were only engaged in ongoing negotiations that might well ultimately fall apart. That is, even assuming the agreement passes a basic "definiteness" test (which we hold below that it does), a trier of fact could find its sparseness to be telling, and this issue should be up to the parties to demonstrate at trial, such as evidence of trade practices. As the record stands, each has a reasonable case that its view is the right one as to customary practices in this arena. Thus the facial ambiguity of the e-mail is matched by the sparseness of the agreed-upon terms given its transactional context.

Our finding of ambiguity need not rest, then, on the draft agreements exchanged by the parties after April 20. Although APS is correct that those drafts would seem to be probative of the parties' intent in the earlier, April 20 e-mail—as noted, the drafts contain strong language making clear that the parties were not obligated unless and until the transaction closed—APS goes on to claim that the court erroneously refused to consider these drafts, a more tenuous assertion.[13] As the district court noted, if intent were indeed objectively manifested in the instrument agreed upon by the parties, here the e-mail, external evidence suggesting that intent was not subjectively present, should not be considered.[14] While APS collects cases in which extrinsic

---

[13] Arguably, the later documents could be considered as further evidence of trade usage, that is, as further evidence that trade claim transactions are not usually binding upon the parties until a contract with full "impairment" terms has been signed. But APS does not advance this specific argument and it is unnecessary for our disposition here.

[14] *See, e.g., Adams v. Petrade Int'l*, 754 S.W.2d 696, 717 (Tex. App.—Houston [1st Dist.] 1988).

evidence was admitted to determine if there was a contract,[15] no case it cites deals with the element of intent, and we are not persuaded that the district court erred in refusing to consider the subsequent exchange of drafts.

Since we have found that there was ambiguity as of April 20, this case was not properly resolved at summary judgment. Because it has not been briefed or argued before us, we leave to the good judgment of the district court the issue of whether either side may now demand fact-finding on liability before a jury instead of at a bench trial.

B

APS would have us go further and render judgment in its favor on the theory that regardless of the parties' intent, the "contract" between the parties' would fail as a matter of law because it is indefinite. APS claims that the e-mail based "contract" found by the district court lacks crucial terms customarily found in trade claim agreements, including "impairment provisions" and other indemnification, repurchase, and risk-shifting mechanisms crafted by parties to trade claim transactions to in response to frequently-arising contingencies.

In order to be a legally enforceable contract, an agreement must be formed around the contours of sufficiently specific terms. "Under Texas law . . . an agreement is not enforceable unless it resolves all essential terms and

---

[15] The cases feature broad language but limited factual analogy. *See Baker v. Baker*, 183 S.W.2d 724, 728 (Tex. 1944) ("Parol evidence is always competent to show the nonexistence of a contract . . . ."); *Bill Shannon, Inc. v. San Clemente*, 724 S.W.2d 941, 943 (Tex. App.—San Antonio 1987, no writ); *Ritter v. Mobil Oil Corp.*, 501 F.2d 170, 172-73 (5th Cir. 1974).

11

leaves no material matters open for future negotiation."[16] "[W]here an agreement leaves essential terms open for future negotiations, it is not a binding contract but, rather, an unenforceable 'agreement to agree.'"[17]

These black-letter rules beg the question of which terms are "essential." "Whether a given term is 'essential' to a contract is a matter of law to be reviewed *de novo*, a determination turning largely on the type of contract at issue . . . ."[18]; "Each contract should be considered separately to determine its material terms."[19] Courts look not only at any relevant written agreements but also at the relationship of the parties, their course of dealings, and then answer the field- and fact-specific question of whether essential terms were sufficiently settled to find a contract. For instance, "[i]n a contract to loan money, the material terms will generally be: the amount to be loaned, maturity date of the loan, the interest rate, and the repayment terms."[20] Seeing the instant transaction as a straightforward "agreement for sale," the

---

[16] *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415 (5th Cir. 1995) (footnote omitted). When conceived in terms of legal enforcement, the principle is in a sense logically demanded, axiomatic: "In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

[17] *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 323 (5th Cir. 2006) (footnote omitted).

[18] *Id.* at 324 (footnotes omitted).

[19] *Boot*, 847 S.W. 2d at 221 (citations omitted).

[20] *Id.* (citations omitted). "As a general matter, Texas courts have consistently held that a contract may be held void for indefiniteness if it fails to specify 'the time of performance, the price to be paid, the work to be done, the service to be rendered, or the property to be transferred.'" *Liberto*, 441 F.3d at 324 (*quoting Engelman Irrigation Dist. v. Shields Bros, Inc.*, 960 S.W. 2d 343, 352 (Tex. App.—Corpus Christi 1997)).

district court looked to the principle that "[t]he basic terms of an agreement for sale are: 1) the thing sold, 2) consideration or price to be paid, and 3) consent of the parties to the exchange." Yet this was no simple sale of goods, as the district court was keenly aware. Rather, it was a high-value transaction involving assets of an abstract and highly particularized nature. Record evidence supports the expectation that in a transaction involving goods of such obviously uncertain legal and economic status, buyer and seller would naturally contemplate bearing certain risks, offering certain guarantees, and demanding certain types of performance in return.[21] Aside from the lonely assurance in the April 20 e-mail that these terms would be

---

[21] In addition to the expert opinion APS has placed in the record, it points to two cases that have emerged from bankruptcies in the Southern District of New York: *Angelo, Gordon* from the Adelphia bankruptcy and *Bear Stearns* from the Delphi bankruptcy. Both cases involve unconsummated agreements to sell trade claims, and in both cases the issue was whether the parties' negotiations resulted in binding legal commitments before they disintegrated. While New York law governed the courts' legal analyses, the facts of these cases generally support APS's position that high-value trade claim purchases, which often bear risk-shifting terms such as indemnification or buy-back rights, are not generally comparable to small-value sales of widgets. *See Bear Stearns Inv. Prod. v. Hitachi Auto. Prod. (USA),* 401 B.R. 598 (S.D.N.Y. 2009) (holding that no contract existed between parties despite agreement on central price term, but denying summary judgment on issue of whether parties nevertheless had a binding obligation under New York law to negotiate in good faith as to the remaining terms); *Angelo, Gordon & Co. v. Dycom Indus.*, 2006 WL 870453 (S.D.N.Y. 2006) (holding, in bench trial involving trade claims, that there was no binding agreement, given the extensive course of dealings and ambiguous agreements and documents exchanged by the parties). In fact, the *Bear Stearns* court explicitly contrasted the lack of risk-protection mechanisms in the transaction that was before it with the omitted terms in *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89 (2d Cir. 2007), in which the court had found a contract even despite the lack of agreement on some minor details: "[T]he disputed terms in the trade documents—namely, impairment or buy back, right to defend and indemnification—are clearly not akin to the relatively trivial details left open in *Tractebel* concerning matters like the 'form of notice' and 'scheduling.'" *Bear Stearns*, 401 B.R. at 617.

done according to "custom," we have little indication that they had made any move toward agreeing on how to allocate these inherent risks.[22]

That said, APS has not produced sufficient evidence of industry standards to persuade that the April 20 e-mail could *not* be definite enough to represent an enforceable agreement, were the fact-finder to determine that the parties intended to form a binding contract with "customary" terms. APS has offered some evidence that custom may not have been utterly consistent in trade claim transactions, and that ascertaining exact terms might have given courts trouble; but its evidence is not sufficient to doom this contract, which may well have been an enforceable one with only relatively minor details to be resolved within the scope of what was customary. If a fact-finder examining the full course of conduct and all the relevant extrinsic evidence finds an intent to be bound, then this contract should not fail for indefiniteness.

## III

On damages, APS claims that even Mesa argued, in some of its summary judgment materials, that the breach occurred not on April 27, which is what the district court held, but on April 24. This makes all the difference, according to APS, because if Mesa had properly mitigated on April 24 instead of waiting longer, its damages would have been negligible. But as

---

[22] Courts hesitate to supply terms in complex financial situations, see *Willowood Condominium Assoc. v. HNC Realty Co.*, 531 F.2d 1249, 1251-53 (5th Cir. 1976) (holding as a matter of law that letters concerning loan payment and re-payment non-binding where they included some concrete information but whose "inadequacies" the court characterized as "major and critical" ); *Ft. Worth Ind. Sch. Dist. v. City of Ft. Worth*, 22 S.W. 3d 831, 846-47 (Tex. 2000) (holding as a matter of law that a letter concerning revisions to be made to a relatively complicated half-century old municipal contract was merely an unenforceable "agreement to agree" in light of its failure to include an essential term).

Mesa responds, and as the district court held, the real issue is not when, in retrospect, the breach occurred, rather when the duty to mitigate arose. As the district court held, Mesa was entitled to endeavor to salvage the contract before beginning to mitigate, given that APS had not at that point expressly repudiated the deal. Once it did so, as the court held, Mesa was so obligated, and the record reflects that it took due efforts toward that end. We find no error in the district court's damage award. The district court may leave those findings aside to await resolution of liability or, in its discretion, revisit them.

We VACATE the finding of liability and remand for proceedings consistent with this opinion.