# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2138

_____

Nabil K. Bissada,

          Appellant,

   v.

Arkansas Children's Hospital; Samuel
Smith; Jonathan Bates; Robert D.B.
Jaquiss; Timothy Martin; Michelle
Moss; Bonnie Taylor; Robert Lyle;
Sandra Taylor; Debra Barrow; Patti
Higginbotham; John and Jane Does,
1-10,

          Appellees.

*
*
*
*
*  Appeal from the United States
*  District Court for the
*  Eastern District of Arkansas.
*
*
*
*
*
*
*
*
*

_____

Submitted: December 15, 2010
Filed: May 12, 2011

_____

Before RILEY, Chief Judge, BEAM and BENTON, Circuit Judges.

_____

RILEY, Chief Judge.

     Nabil K. Bissada, M.D., appeals the district court's[1] grant of summary judgment to Arkansas Children's Hospital (ACH), Samuel Smith, Jonathan Bates, Robert D.B.

_____

[1]The Honorable J. Leon Holmes, Chief Judge, United States District Court for the Eastern District of Arkansas.

Jaquiss, Timothy Martin, Michelle Moss, Bonnie Taylor, Robert Lyle, Sandra Taylor, Debra Barrow, Patti Higginbotham, and John and Jane Does 1-10 (collectively, appellees). Dr. Bissada, a pediatric urologist, alleged appellees engaged in "sham peer review" when they suspended his hospital privileges and reported the suspension to the national practitioner data bank (NPDB) without a required hearing. The district court granted summary judgment to appellees on Dr. Bissada's 42 U.S.C. §§ 1981, 2000d (Title VI) and 2000e (Title VII) claims and declined to exercise jurisdiction over his Arkansas state law claims for violation of the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-101, et seq., defamation, and tortious interference. Dr. Bissada appeals, and we affirm.

## I.  BACKGROUND[2]

Dr. Bissada is a professor and practitioner in reconstructive urology, credited with numerous appointments, publications, presentations, funded research projects, visiting professorships and guest lectureships. In May 2003, the University of Arkansas for Medical Sciences (UAMS), a Little Rock, Arkansas, teaching hospital and not a party here, hired Dr. Bissada to be President of its Department of Urology. While with UAMS, Dr. Bissada also served as Chief of Pediatric Urology at ACH.

### A.  ACH Revokes Dr. Bissada's Medical Staff Privileges

In November 2006, ACH's Vice President of Patient Care Services Sandra Taylor, R.N., told Medical Director Dr. Bonnie Taylor about certain concerns she had about Dr. Bissada's practice. Sandra Taylor's concerns related to patient care and outcomes, specifically alleging (1) lack of communication with patient families, (2) repeated surgical and clinical cancellations, (3) complications resulting from delayed surgical proceedings, and (4) lack of confidence in Dr. Bissada's abilities.

---

[2]We view the record de novo in the light most favorable to Dr. Bissada, drawing all reasonable inferences in his favor. See Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010).

Pursuant to ACH's bylaws, Dr. Bonnie Taylor brought the matter to ACH's medical staff executive committee (executive committee) which held a special meeting and appointed an ad hoc committee, consisting of Chief of Cardiac Surgery Dr. Robert Jaquiss, Chief of Anesthesia Dr. Timothy Martin, and Dr. Robert Lyle, to investigate the allegations.

The ad hoc committee began its investigation on November 30, 2006. The committee reviewed the records of eighteen of Dr. Bissada's patients, the results of his Press-Ganey surveys,[3] and clinic attendance and cancellation data. On December 6, 2006, the committee interviewed Dr. Bissada. During the interview, committee members asked Dr. Bissada "about delays between the decision to perform a surgery and the performance of that surgery; complications arising from hypospadias repairs; Bissada's clinic cancellation rate; patient family complaints; on-call coverage; and the removal of labia adhesions in the clinic without anesthesia." Bissada v. Arkansas Children's Hosp., 2009 WL 1010869, at *2 (E.D. Ark. 2009).

On December 12, 2006, the ad hoc committee issued a report, making a number of negative findings about Dr. Bissada, including:

1.      Dr. Bissada's consistent delays in the performance of surgical procedures lead[] to questionable outcomes.

2.      Dr. Bissada's lack of communication with both local physicians and parents is a problem.

3.      The cancellation rate for Dr. Bissada's clinic is excessive and unacceptable.

---

[3]Press Ganey Associates, Inc. is "an independent entity which conducts patient satisfaction surveys for healthcare providers." Hazard-Chaney v. Optima Healthcare, No. CIV. 0-355-B, 2001 WL 1636433, at *2 n.4 (D.N.H. Dec. 18, 2001).

4.      There is [a] lack of an effective mechanism for completeness of patient follow-up on Dr. Bissada's practice which results in patients becoming lost.

5.      The rate of complications in Dr. Bissada's cases, based upon our review, seems to be more frequent than we would ordinarily expect.

6.      These issues indicate a general lack of judgment on the part of Dr. Bissada.

The ad hoc committee recommended referral of the eighteen cases "to an outside reviewer[,] specifically a pediatric urologist, for further review." The executive committee extended Dr. Bissada's hospital privileges, which were set to expire on December 31, 2006, for one month, and sent the eighteen cases to Dr. Anthony Balcom, an outside pediatric urologist, for review. See id.

On January 9, 2007, Dr. Balcom returned a seventeen-page review, concluding (1) the charts showed "a pattern of highly irregular scheduling activities," (2) Dr. Balcom could not comment on Dr. Bissada's complication rates because he did not know how many of each type of procedure Dr. Bissada performed during the time period covered by the charts, and (3) "the complication rate after pyeloplasty in terms of recurrent obstruction is concerningly high." The executive committee met that same day and voted to revoke Dr. Bissada's medical staff privileges.

The next day, January 10, 2007, ACH notified Dr. Bissada his privileges were revoked and that he was entitled to a hearing to appeal the revocation. Dr. Bissada retained counsel and requested an appeal hearing before the executive committee, which was eventually scheduled for August 20, 2007.

## B.    Settlement Negotiations

While the appeal hearing was pending, counsel for Dr. Bissada and ACH engaged in several rounds of settlement negotiations.  The negotiations revolved around whether ACH would reinstate Dr. Bissada's privileges in exchange for his immediately resigning, and what language would be reported to the NPDB.  On August 17, 2007, a paralegal employed by one of Dr. Bissada's lawyers, Robert McHenry,[4] sent the following email to Lynda Johnson, ACH's counsel:

> Dear Lynda,
>
> Dr. Bissada will agree to the language proposed by you as set out as Exhibit A.
>
> This letter will also confirm that the hearing WILL NOT be held on Monday, August 20, 2007.  I will send a hard copy of this letter and Settlement Agreement on Monday.
>
> Sincerely, Robert McHenry

Two documents, entitled "Settlement Agreement" and "Exhibit A," were attached to the email.  The text of the settlement agreement states, "In consideration of the parties agreeing to the language to be sent to the [NPDB] (see attached Exhibit A) and Dr. Nabil Bissada's agreement to not reapply for privileges at ACH, ACH agrees to end its investigation and Dr. Bissada agrees not to reapply for privileges." Exhibit A states:

> Dr. Nabil Bissada's privileges were recommended to be revoked by the Executive Committee of the [ACH] medical staff as a part of an investigation concerning Dr. Bissada's professional competence.

---

[4]McHenry later testified that, because he is a Neanderthal and does not "do email," his paralegal sends his email messages for him.  See Hendry v. Schneider, 116 F.3d 446, 450 n.4 (10th Cir. 1997) (defining a Neanderthal).

Pursuant to the ACH By-Laws, Dr. Bissada requested a hearing so that he could oppose the above mentioned recommendation. Because a settlement was reached between the parties, Dr. Bissada's privileges expired before final action was taken. Dr. Bissada chose not to reapply for privileges at [ACH].

McHenry and Dr. Bissada both testified they discussed the contents of the email before it was sent. McHenry also discussed the terms of the email with Johnson, who told him the case was settled and there would be no hearing. ACH reported the "Exhibit A" language to the NPDB that same day.

The next day, Saturday, August 18, 2007, Dr. Bissada wrote a letter to ACH, which he faxed on Monday, August 20, 2007:

The settlement agreement E-mailed by Mr. McHenry is not acceptable to me. I will not sign this agreement. I wish to engage another legal counsel as soon as possible. And [I] will notify you with his name once I do. I would ask that a hearing would be scheduled at a mutually acceptable time.

Johnson immediately replied, by hand delivery,

There was a settlement reached between you and your legal counsel and ACH and me on Friday, August 17, 2007. I received an e-mail confirming your agreement to the settlement from your legal counsel on Friday, August 17, 2007. Based upon that settlement, actions were taken to cancel the hearing which had been set for August 20, 2007.

Johnson's letter did not mention the "Exhibit A" language had already been reported to the NPDB.

## C.     Prior Proceedings

From the beginning, Dr. Bissada denied the allegations against him. He objected to the ad hoc committee's report, and refers to the concerns about communication with

families, surgical and clinic cancellations, and complications resulting from delayed procedures as "trivial," "superficial," "plainly of a pretextual nature," and "nothing of a serious nature." Dr. Bissada suggests the ad hoc committee's concern about his performance of certain procedures using local, rather than general, anesthetic was motivated by a desire to make money, and ACH nurses, not Dr. Bissada, were to blame for patients becoming "lost" in his practice.

Throughout the process, Dr. Bissada argued the ad hoc committee "cherry-picked" the eighteen cases it selected for internal and external review. Dr. Bissada argues ACH's external reviewer, Dr. Balcom, discredited ACH's review when he concluded, "Some of the complications in this chart review of 18 series have been 'expected', not uncommon complications, but the total number of cases done in this time period is not known to me, so interpretation of the complication rates to compare to typical complication rates is not possible." Nevertheless, Dr. Balcom opined that "the complication rate after pyeloplasty in terms of recurrent obstruction is concerningly high."

Dr. Bissada engaged four of his own external reviewers, who uniformly support him. Three of these reviewers question the case selection. Dr. Moneer Hanna questioned "the reasons behind the selection of these cases, while ignoring the operative log which demonstrates a low overall complication rate." Professor Darius Bägli reviewed the eighteen cases and Dr. Bissada's log and commented that "there appears to be no basis for the selection of these cases from the approximately 1000 cases done by Dr. Bissada." After his review, Dr. Anthony Kaczmarek was "uncertain how these cases fell out for review."

On August 27, 2007, Dr. Bissada sued ACH in Arkansas state court, alleging he and ACH had merely agreed to agree to a settlement, but had not finally agreed. In an affidavit attached to his state court complaint, Bissada swore he (1) "did not . . . consider that [he] had agreed irrevocably to the proposed terms of [the] agreement,"

and (2) had "never in my life been party to a final agreement without my actual signature, and I did not intend to agree to the terms of the letter which has since been sent to the [NPDB]." This lawsuit prayed for an injunction against ACH reporting to the NPDB. The disposition of the state court lawsuit is not in the appellate record.

On January 22, 2008, Dr. Bissada filed a charge of discrimination against ACH with the United States Equal Employment Opportunity Commission (EEOC), alleging ACH discharged him on January 9, 2007, because of his Egyptian national origin. Dr. Bissada is an Egyptian Copt, which describes a group of Egyptian Christians.[5] On January 29, 2008, the EEOC dismissed his charge as untimely and notified Dr. Bissada of his right to sue.

On April 24, 2008, Dr. Bissada commenced this action in the district court. In his 47-page amended and substituted complaint, Dr. Bissada asserted federal causes of action for violations of 42 U.S.C. §§ 1981 (racial and national origin discrimination), 1985 (conspiracy to deprive civil rights), 2000d (Title VI discrimination), 2000e (Title VII discrimination) and 15 U.S.C. § 2 (monopolization under the Sherman Antitrust Act), as well as state claims for retaliation under the Arkansas Whistle-Blower Act, Ark. Code Ann. § 21-1-601, et seq., violation of the Arkansas civil rights act, § 16-123-101, et seq., defamation, tortious interference with prospective business relations and tortious interference with contracts. Dr. Bissada later withdrew or conceded the inapplicability of his 42 U.S.C. § 1985 claim for conspiracy, his 15 U.S.C. § 2 Sherman Act claim, and his Arkansas Whistle-Blower Act claim.

_____

[5]"Copts are the largest Christian community in the Middle East, dating to 42 AD when Saint Mark is believed to have founded the first church in Alexandria. Nonetheless, Egypt's Coptic minority presently makes up only eight to ten percent of the country's population and has been a frequent target of discrimination and violence throughout Egypt's history." Mansour v. Ashcroft, 390 F.3d 667, 675 (9th Cir. 2004) (Pregerson, J., concurring in part and dissenting in part).

On February 26, 2009, appellees filed three separate motions for summary judgment: (1) "Pursuant to the Charitable Immunity Doctrine," (2) "on the Basis of Settlement," and (3) "on Plaintiff[']s Substantive Claims." The district court granted ACH's third motion, concluding Dr. Bissada "failed to present sufficient evidence to create a genuine issue of material fact regarding his § 1981, Title VII, and Title VI claims" and denied ACH's first and second motions as moot. Finding only state claims remaining, the district court declined to exercise supplemental jurisdiction and dismissed Dr. Bissada's remaining causes of action without prejudice. Dr. Bissada appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.    DISCUSSION
### A.    Standard of Review

"This court reviews a grant of summary judgment *de novo*, viewing the record most favorably to the non-moving party." Lake v. Yellow Transp., Inc., 596 F.3d 871, 873 (8th Cir. 2010). "We review the district court's decision not to exercise supplemental jurisdiction over the remaining state-law claims for an abuse of discretion." Glorvigen v. Cirrus Design Corp., 581 F.3d 737, 743 (8th Cir. 2009).

### B.    Title VII

Dr. Bissada claims appellees violated his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. In order to pursue a Title VII action, plaintiffs generally must file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred. See § 2000e-5(e)(1). As noted above, Dr. Bissada filed his EEOC charge on January 22, 2008, complaining ACH discharged him on January 9, 2007 because of his national origin. The EEOC properly dismissed this charge as untimely.

Because Dr. Bissada's Title VII claim flows from his EEOC charge, his claim was properly brought in the district court. "The exhaustion requirement may be satisfied if the civil claim grows out of or is like or reasonably related to the substance

of the allegations in the administrative charge, but the civil suit can be only as broad as the scope of any investigation that reasonably could have been expected to result from the initial charge of discrimination." Fanning v. Potter, 614 F.3d 845, 851-52 (8th Cir. 2010) (citations and internal quotation marks omitted). In his EEOC charge, Dr. Bissada alleged ACH discriminated against him on January 9, 2007, the date the executive committee voted to revoke his staff privileges, based upon his national origin. In the district court, Dr. Bissada alleged he was discriminated against based upon his race or national origin when the revocation became final and was reported to the NPDB on August 17 and August 20, 2007, either date falling within the 180-day period.

Assuming, without deciding, whether Dr. Bissada's Title VII claim was properly before the district court, the court correctly dismissed the claim because the parties had previously agreed to a settlement. In order to establish his prima facie case under Title VII, Dr. Bissada must show, among other things, he "suffered an adverse employment action." Norman v. Union Pac. R.R., 606 F.3d 455, 461 (8th Cir. 2010) (setting forth the elements of a prima facie case of discrimination). The district court held,

> At some point after Bissada's offer was extended on August 17, 2007, Bissada apparently changed his mind. Bissada did not communicate his desire to withdraw his offer until August 20, 2007, but by that time ACH had already accepted his offer, issued the agreed-upon report to the [NPDB], and cancelled his hearing. Because Bissada agreed to the actions of which he now complains—namely, the report to the [NPDB] and the denial of his hearing—those actions cannot constitute discriminatory acts forming the basis of a Title VII claim.

We agree with the district court that, because appellees' report to the NPDB and cancellation of the August 20 hearing were actions undertaken pursuant to the parties' settlement agreement, they were done with Dr. Bissada's consent. Under these circumstances, Dr. Bissada cannot now claim he suffered an adverse employment action because the action was taken with his knowledge and consent.

-10-

Dr. Bissada argues his email containing the draft settlement agreement was not an offer at all, but rather was a suggestion of what his offer would be when he later made it. Dr. Bissada seizes on the language in the email that he "will agree" to the settlement as proof he had not yet agreed, contending ACH's acceptance of his offer to agree later is an unenforceable "agreement to agree" under Arkansas law. Dr. Bissada contends, "The decision below was incorrect as a matter of law in inferring a binding settlement agreement to the detriment of Dr. Bissada without his signing anything, without the counsel for Defendant ACH clearly confirming a settlement, and without any other consummation of the deal." But the district court decided it was "clear from the record that Bissada agreed to the language that [his lawyer] communicated to [ACH's lawyer] as an offer, which [ACH's lawyer] thereafter accepted, forming a contract or agreement." See Ark. Anthracite Coal & Land Co. v. Dunlap, 218 S.W. 839, 841 (Ark. 1920). So do we. Dr. Bissada may not have signed a final formalized agreement with ACH, but he did make a settlement offer, which ACH's counsel verbally accepted, and ACH relied upon in taking significant action.

"An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981) (Restatement); see also ERC Mortg. Grp., Inc. v. Luper, 795 S.W.2d 362, 364 (Ark. Ct. App. 1990) (applying Restatement § 24) overruled in part on other grounds by Mosley Mach. Co. v. Gray Supply Co., 837 S.W.2d 462 (Ark. 1992) (per curiam). On August 17, 2007, Dr. Bissada indicated through counsel that he would agree to the settlement terms included with his email message, and confirmed the cancellation of the August 20 hearing. That same day, counsel for ACH verbally accepted Dr. Bissada's offer and filed the agreed upon language with the NPDB. Under Arkansas law, this exchange formed a contract. See Luper, 795 S.W.2d at 364 (declaring either verbal acceptance or subsequent performance is sufficient to satisfy manifestation of acceptance).

-11-

Dr. Bissada also suggests negotiations communicated over email should be presumed not to constitute an agreement unless and until a document is formally signed. Dr. Bissada relies primarily upon APS Capital Corp. v. Mesa Air Grp., Inc., 580 F.3d 265 (5th Cir. 2009), to support his contention that email exchanges and telephone calls are insufficient to form a binding agreement. But APS Capital does not stand for this proposition. Noting that under Texas law "[t]he parties' intent to be bound is the salient issue," the APS Capital court found many ambiguities between the various exchanges as to whether the parties had a deal, which cast sufficient doubt on the parties' intent to preclude summary judgment. Id. at 269-72. More specifically, early in the process, a series of messages was sent agreeing in principle to the outlines of a deal, and then later as drafts were circulated and negotiated, there were express disclaimers on all the messages indicating there was no deal yet. See id. at 269-70.

This case is different from APS Capital. Here, as the district court stated, there is no dispute Dr. Bissada "agreed to the language that [his lawyer] communicated to [ACH's lawyer] as an offer." Nor is this a case where the offeror inadvertently made an offer.[6] As the district court noted, "Bissada apparently changed his mind." But by that time ACH had already accepted, told Bissada's lawyer, sent the entry to the NPDB, and cancelled the hearing. Because Dr. Bissada agreed to the language sent to the NPDB and to the cancellation of his hearing, the district court correctly concluded Dr. Bissada could not base a Title VII claim on those actions, and properly granted summary judgment against Dr. Bissada.

## C.    Section 1981

The district court dismissed Dr. Bissada's section 1981 claim for two reasons. First, to the extent Dr. Bissada's claim is based on his Egyptian national origin, as

---

[6]This was not a complex transaction. The settlement agreement consists entirely of the single sentence quoted above, plus a caption and signature blocks. "Exhibit A" is nothing more than the brief language to be sent to the NPDB with a caption and addressee.

opposed to his race, § 1981 does not apply because "§ 1981 forbids racial discrimination, or discrimination against someone 'because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of *homo sapiens*.'" Bissada, 2009 WL 1010869, at *6 (quoting St. Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987)). Second, the district court found, even if Dr. Bissada's claim is based upon his race as an "Egyptian Copt,"[7] he provided insufficient evidence that ACH's legitimate race-neutral reasons for the suspension of his privileges were pretextual. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-05 (1973).

The only evidence in the record relevant to pretext is (1) Sandra Taylor's August and September 2004 notes documenting "multiple complaints by her and other nurses regarding Bissada's behavior and practice, and on a few occasions the notes make reference to 'cultural' differences between Bissada and his co-workers when describing possible reasons for difficulties," and (2) Dr. Smith's comment to Dr. Bissada that "you are not one of us." The district court reasoned Dr. Bissada "presented no evidence showing that [Nurse Sandra] Taylor and [Dr. Samuel] Smith exerted control over or influenced the committee's decisions. There is no evidence that [Sandra] Taylor and the other nurses revoked or had the power to revoke Bissada's privileges at ACH, nor is there evidence that Smith had any control or exerted any influence over the Ad Hoc Committee's investigation or the Executive Committee's decision to revoke Bissada's privileges . . . ." We agree with the district court.

Dr. Bissada asserts the triviality of ACH's reasons for terminating his privileges is itself evidence the reasons were pretextual. However, "federal courts do not serve as 'super-personnel departments,' sitting in judgment of an employer's business decisions absent evidence of discrimination." Anderson v. Durham D & M, LLC, 606 F.3d 513, 522 (8th Cir. 2010). Nor does the fact two previous Egyptian Copt medical

---

[7]The district court assumed that Egyptian Copt is a race for the purposes of section 1981, and because it is unnecessary for us to reach the issue, so do we.

residents had difficulties at ACH suggest a Chief of Pediatric Urology like Dr. Bissada suffered discrimination. See Chism v. Curtner, 619 F.3d 979, 984 (8th Cir. 2010) ("The test to determine whether individuals are similarly situated 'is rigorous and requires that the other employees be similarly situated in all relevant respects before the plaintiff can introduce evidence comparing herself to the other employees.'" (quoting Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 864 (8th Cir. 2008))). We affirm the § 1981 claim dismissal.

### D.     Title VI

Dr. Bissada also brought a claim under Title VI, which provides, "No person in the United States shall, on the ground of . . . national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d. Title VI provides that it "shall [not] be construed to authorize action . . . with respect to any employment practice of any employer . . . except when a primary objective of the Federal financial assistance is to provide employment."  § 2000d-3.

Dr. Bissada argues the fact ACH receives Medicaid funds subjects it to Title VI liability.  The district court recognized, to date, our court has yet to rule on this issue. Even if we were to agree Title VI applies to hospitals because of their receipt of Medicaid funds, a question we do not reach today, Dr. Bissada still cannot maintain his claim because, for the reasons stated above, Dr. Bissada failed to present sufficient evidence to allow a reasonable jury to find any of appellees' acts were a pretext for national origin discrimination.

### E.     State Law Claims

Lastly, Dr. Bissada appeals the district court's dismissal of his state law claims. Dr. Bissada asserts the district court's enforcement of the settlement agreement

unjustifiably precludes . . . Bissada's state law claim for defamation, and hinders his ability to clear his name. . . . His claim for ongoing defamation by the [NPDB] entry, for example, could not proceed if precluded by the ruling of the lower court that he agreed to a settlement. . . . The decision below should be reversed if for no other reason than to allow . . . Bissada to pursue his state law claims — including removal of the ongoing smear of his reputation in the [NPDB] — without preclusion by a settlement that never happened.

ACH reminds us of the court's preference to decline to exercise supplemental jurisdiction after all federal claims are dismissed. See, e.g., Glorvigen v. Cirrus Design Corp., 581 F.3d 737, 749 (8th Cir. 2009). Because we conclude Dr. Bissada did agree to a settlement, we find no error.

## III.   CONCLUSION
We affirm the district court's judgment.

BEAM, Circuit Judge, concurring in part.

I concur in the result and in all portions of the opinion except for footnote 7.
_____

-15-